**UNITED STATES of America for the Use and Benefit of JAMES E. SIMON CO., Inc., and James E. Simon Co., Inc., Plaintiffs,**

v.

**ARDELT–HORN CONSTRUCTION CO. and St. Paul Fire & Marine Insurance Company, Defendants.**

**Civ. 1527 L.**

United States District Court, D. Nebraska.

Aug. 4, 1970.

Richard W. Smith and Allen L. Overcash, of Woods, Aitken & Aitken, Lincoln, Neb., for plaintiffs.

John J. Higgins, Jr. of Eisenstatt, Morrison, Higgins, Miller, Kinnamon & Morrison, Omaha, Neb., and Roland E. Gebert, Littleton, Colo., for defendant, Ardelt-Horn Construction Co.

Edwin Cassem, of Cassem, Tierney & Henatsch, Omaha, Neb., and Martin J. Andrew, Denver, Colo., for defendant St. Paul Fire & Marine Insurance Co.

## MEMORANDUM

URBOM, District Judge.

James E. Simon Co., Inc., individually and as use plaintiff, brings this action for recovery of unpaid amounts claimed to be due it as a subcontractor which furnished labor and materials for a project on which the defendant Ardelt-Horn Construction Co. was the general contractor and the United States of America was the owner. The defendant St. Paul Fire & Marine Insurance Company was the surety on a payment bond and on a performance bond required by the Miller Act, 40 U.S.C. § 270a. Three claims are asserted: (1) against the general contractor by the subcontractor individually, (2) against the general contractor and the surety on the payment bond by the subcontractor as use plaintiff, and (3) against the general contractor and the surety on the performance bond by the subcontractor as use plaintiff.

The general contractor has filed a motion to dismiss the complaint and the surety has filed a motion to dismiss the second and third claims and to strike the second claim.

## I. FIRST CLAIM FOR RELIEF

The complaint alleges that the general contractor entered into a contract with the United States for the construction of certain bituminous pavement and railroad track at the Cornhusker Army Ammo Plant near Grand Island, Nebraska, and that the general contractor thereafter made written and oral subcontracts with the subcontractor for the performing of certain labor and the furnishing of certain material for such project; that the subcontractor performed requirements of the subcontracts; and that the general contractor has not paid the subcontractor.

The subcontractor, James E. Simon Co., Inc., is alleged to be a corporation organized under the laws of Nebraska with its principal place of business in North Platte, Nebraska. The general contractor, Ardelt-Horn Construction Co., is alleged to be a corporation organized under the laws of Colorado with its principal place of business in Colorado. The amount prayed for far exceeds the $10,000.00 diversity jurisdiction requirement.

Contention is made that the Miller Act provides a subcontractor's exclusive remedy. Tit. 40 § 270b states:

"(a) Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under section 270a of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him * * *.

"(b) Every suit instituted under this section shall be brought in the name of the United States for the use of the person suing, in the United States District Court for any district in which the contract was to be performed and executed and not elsewhere, irrespective of the amount in controversy in such suit, but no such suit shall be commenced after the expiration of one year after the day on which the last of the labor was performed or material was supplied by him. The United States shall not be liable for the pay-

ment of any costs or expenses of any such suit."

This language does not convey a declaration of exclusion of other remedies against the general contractor. While it may be that any suit on a bond furnished in accordance with the Miller Act must meet all the requirements of § 270b, no case has been found by this court that holds that an action against the general contractor because of breach of a subcontract or due under a subcontract would not lie. The general contractor in its brief asserts that the subcontractor has the option of suing the contractor for breach of contract or of making claim under provisions of the Miller Act, but cannot do both. Cited to support that proposition are Gichner v. Insurance Companies of North America, 180 A.2d 842 (M.C.App.1962); United States for use and on behalf of B. Katchen Iron Works, Inc. v. Standard Accident Insurance Co., 158 F.Supp. 616 (U.S.D.C. N.J. 1958), aff'd 257 F.2d 78 (C.A. 3rd Cir. 1958); United States for use and benefit of Noland Company v. Skinner & Ruddock, 164 F.Supp. 616 (U.S.D.C. E.D. S.C. 1958); and United States for use of Susi Contracting Company v. Zara Contracting Co., Inc., 146 F.2d 606 (C.A. 2d Cir. 1944), which hold only that when an action is filed on a payment bond furnished under the Miller Act, the requirements of the Miller Act regarding the time and manner of filing a claim must be followed, and Schwasnick v. Blandin, 65 F.2d 354 (C.A. 2nd Cir. 1933); Knotts v. Clark Const. Co., 249 F. 181 (C.A. 7th Cir. 1918); St. Paul-Mercury Indemnity Company v. United States, 238 F.2d 917 (C.A. 10th Cir. 1956); Southern Painting Company of Tennessee v. United States for the use of Silver, 222 F.2d 431 (C.A. 10th Cir. 1955); and Continental Casualty Company v. Schaefer, 173 F.2d 5 (C.A. 9th Cir. 1949), which permit, but none requires, the subcontractor to waive the breach of contract and sue in quantum meruit. None of these cases suggests that either suit for breach of contract or

suit in quantum meruit results in loss of rights on a surety bond.

■ The plaintiff is entitled to pursue his cause of action against the general contractor on the subcontract or because of breach of the subcontract at the same time that he relies upon his remedies on the payment bond.

Jurisdiction is conferred by 28 U.S.C. § 1332 and the first claim for relief states facts upon which relief may be granted.

The motion of the defendant Ardelt-Horn Construction Co. to dismiss, including the assertion of lack of jurisdiction, as it relates to the first claim, will be denied.

## II. SECOND CLAIM FOR RELIEF

This claim seeks to recover on the payment bond furnished by the general contractor, which was provided by the general contractor to assure payment for those who furnished labor and material for the project. The only point made in the motions to dismiss and to strike is that exactly the same claim is asserted in another action now pending in this court, Civ. 1461 L. In that action a different subcontractor, as use plaintiff, sued the general contractor and the surety. James E. Simon Co., Inc. thereafter was interpleaded and filed its claim in interpleader against the surety and its cross-claim against the general contractor. In that claim in interpleader and cross-claim James E. Simon Co., Inc. alleges the same facts that it alleges in the second claim for relief in the present action and asks for the same relief.

The only reason assigned by James E. Simon Co., Inc. for the filing of the second claim for relief in this action was by way of oral argument when its counsel suggested that he wanted to be certain that "all the i's were dotted and t's were crossed" and that since the Miller Act speaks of "suit instituted," he wished to preclude any argument that appearance as an interpleaded defendant

in Civ. 1461 L.was not the institution of a suit. The surety in its brief has stated that it will not assert and does waive any defense to the effect that James E. Simon Co., Inc., has not "instituted" suit by appearing as an interpleaded defendant in Civ. 1461 L.

██ Under the circumstances, this court sees no valid reason for permitting two actions to proceed simultaneously in the same court on the same claim. The motion of Ardelt-Horn Construction Co. to dismiss the complaint and the motion of St. Paul Fire & Marine Insurance Company to dismiss and to strike will be sustained insofar as they relate to the second claim for relief, but the dismissal will be without prejudice.

## III. THIRD CLAIM FOR RELIEF

The issue presented is whether a subcontractor who has furnished labor and material is entitled to recover on a bond assuring the performance of a prime contractor where the surety has also provided a bond for the payment of suppliers of labor and material, as required by the Miller Act. Only two cases have been found which directly answer the question. United States for Use of Edward Hines Lumber Co. v. Kalady Construction Company, 227 F.Supp. 1017 (U.S.D.C. N.D. Ill. E.D. 1964) answers in the affirmative, and Sun Insurance Co. of New York v. Diversified Engineers, Inc., 240 F.Supp. 606 (U.S.D.C. Mont. 1965) answers in the negative.

The obligations of the surety and the principal, the general contractor, and the rights of the subcontractor must be determined by the contractual provisions of the performance bond and, because the bond refers to it, the contract between the general contractor and the United States. Hereinafter, reference to "the contract" means only the agreement between the general contractor and the United States. As the Miller Act was the mandatory authority for issuance of the performance bond as well as the payment bond, the Act and its legislative history may assist in learning the intent of the contracting parties to the performance bond.

The pivotal issue is whether the United States, the general contractor, and the surety intended that a supplier of labor and material under a subcontract be a beneficiary of the performance bond.

A copy of the performance bond, attached to the complaint, shows that the condition of the obligation of the surety and the principal was that "the Principal shall perform and fulfill all the undertakings, covenants, terms, conditions, and agreements of said contract * * *."

A copy of the contract is not before the court. In its brief the subcontractor sets out provisions which it says and the surety in its brief agrees are contained in the contract.[1] In essence, they: require the prime contractor to "prosecute the work diligently and complete the en-

1. "1. COMMENCEMENT, PROSECUTION AND COMPLETION OF WORK. The Contractor shall commence work under this contract within ten (10) calendar days after the date of receipt by him of Notice to Proceed, prosecute said work diligently and complete the entire work ready for use not later than the number of calendar days after receipt of Notice to Proceed as set out in Completion Schedule below. The time stated for completion shall include final cleanup of the premises.

"26. PAYMENT. Payment for the various items listed in the Bidding Schedule shall constitute full compensation for furnishing all plant, labor, equipment, appliances and materials and

for performing all operations required to complete the work in conformity with the drawings and specifications. All costs in connection with work not specifically mentioned in the Bidding Schedule shall be included in the contract prices for the items listed.

"7. PAYMENTS TO CONTRACTOR

"(a) The Government will pay the contract price as hereinafter provided.

"(b) The Government will make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer, on estimates approved by the Contracting Officer. If requested by the Contracting Officer, the Contractor shall furnish a breakdown of the total con-

tire work"; state that payment of the items listed on the Bidding Schedule shall be full compensation "for furnishing all plant, labor, equipment, appliances and materials and for performing all operations"; require the government to pay the contract price, including progress payments based upon the portion of the contract price included for each principal category of work; permit the taking into consideration in the making of progress payments the material delivered to the site, as well as material delivered elsewhere under certain circumstances; authorize the withholding of a percentage of the contract price until completion; provide that all material and work covered by the progress payments made "shall thereupon become the sole property of the Government"; and require final payment upon presentation of releases "of all claims against

the Government acquired by virtue of this contract."

It may be assumed also that the contract required the general contractor to furnish a payment bond assuring the payment by the general contractor of materialmen and a performance bond guaranteeing compliance by the general contractor of the provisions of the contract.

Nothing in these provisions of the contract gives any clear hint at an intent that the materialmen would have rights under a performance bond.

The subcontractor argues that the contract contemplated that the general contractor "will furnish" labor and material and that such a contemplation carried with it an obligation on the part of the general contractor to pay for such labor and material actually furnished by a subcontractor and that failure to pay

---

tract price showing the amount included therein for each principal category of the work, in such detail as requested, to provide a basis for determining progress payments. In the preparation of estimates the Contracting Officer, at his discretion, may authorize material delivered on the site and preparatory work done to be taken into consideration. Material delivered to the Contractor at locations other than the site may also be taken into consideration (1) if such consideration is specifically authorized by the contract and (2) if the Contractor furnishes satisfactory evidence that he has acquired title to such material and that it will be utilized on the work covered by this contract.

"(c) In making such progress payments, there shall be retained 10 percent of the estimated amount until final completion and acceptance of the contract work. However, if the Contracting Officer, at any time after 50 percent of the work has been completed, finds that satisfactory progress is being made, he may authorize any of the remaining progress payments to be made in full. Also, whenever the work is substantially complete, the Contracting Officer, if he considers the amount retained to be in excess of the amount adequate for the protection of the Government, at his discretion, may release to the Contractor all or a portion of such excess amount. Furthermore, on completion and acceptance of each separate building, public

work, or other division of the contract, on which the price is stated separately in the contract, payment may be made therefor without retention of a percentage.

"(d) All material and work covered by progress payments made shall thereupon become the sole property of the Government, but this provision shall not be construed as relieving the Contractor from the sole responsibility for all material and work upon which payments have been made or the restoration of any damaged work, or as waiving the right of the Government to require the fulfillment of all of the terms of the contract.

"(e) Upon completion and acceptance of all work, the amount due the Contractor under this contract shall be paid upon the presentation of a properly executed voucher and after the Contractor shall have furnished the Government with a release, if required, of all claims against the Government, arising by virtue of this contract, other than claims in stated amounts as may be specifically excepted by the Contractor from the operation of the release. If the Contractor's claim to amounts payable under the contract has been assigned under the Assignment of Claims Act of 1940, as amended, (31 U.S.C. § 203, 41 U.S.C. § 15), a release may also be required by the assignee."

therefor constituted a failure to perform "all the undertakings, covenants, terms, conditions, and agreements of this contract," thereby triggering liability on the performance bond. Principally relied upon are American Casualty Co. of Reading, Pa. v. Brezina Construction Co., 295 F.2d 603 (C.A. 8th Cir. 1961); Continental Casualty Company v. United States, 169 F.Supp. 945, 145 Ct.Cl. 99 (1959); Pearlman v. Reliance Insurance Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed. 2d 190 (1962); and United States for Use of Edward Hines Lumber Co. v. Kalady Construction Company, 227 F.Supp. 1017 (U.S.D.C. N.D. Ill. E.D. 1964).

The *Brezina* case, which did not construe a Miller Act bond, held that an agreement by a subcontractor to furnish materials carries with it an agreement to pay the suppliers of those materials and that the surety on the contractor's performance bond must pay the prime contractor the amount which the prime contractor had to pay the suppliers of the materials which the subcontractor failed to pay. The court distinguished earlier Eighth Circuit cases of United States for Use of W. B. Young Supply Co. v. Stewart, 288 F. 187 (1923), cert. denied 263 U.S. 699, 44 S.Ct. 5, 68 L.Ed. 513, and Babcock & Wilcox v. American Surety Co., 236 F. 340 (1916), which had held that an agreement to furnish was not the equivalent of an agreement to pay. The court in the *Brezina* case was careful not to overrule those earlier decisions, but rather distinguished them by observing that each of the earlier actions was brought by the materialman or on his behalf, not by the obligee of the bond. The court in the *Brezina* case further said:

"The Court [Judge Parker speaking in Saint Paul Mercury Indemnity Co. v. Wright Contracting Co., 250 F.2d 758, C.A. 4th Cir. 1958] also made the pertinent observation that the situation would be different if the person in whose favor the bond runs is under no obligation to pay for the supplies and material furnished and lien therefor cannot be obtained on the property to his detriment, and made this pronouncement:

'Where, as here, the prime contractor is bound to pay for materials used on the project, whether furnished by himself or a subcontractor, failure of a subcontractor to pay for materials furnished him is in precisely the same category as failure of a contractor to pay for labor or materials giving rise to a laborers' or materialmen's lien; and it is generally held that loss resulting from such failure and the assertion of such a lien is covered by a performance bond, whether or not payment for labor or materials is expressly required by the bond or contract.' "

In the present case the wider construction of "furnish" is required on neither score. The present action is for the materialman, not for or by the obligee, the United States, and the United States would not be liable to the materialman,[2] both factors being contrary to the situation in *Brezina*.

Continental Casualty Company v. United States, supra, was an action by a surety which had paid laborers and materialmen who had not been paid by the general contractor on projects owned by the United States. The surety sought recovery of funds which had been withheld by the United States. The court held that the surety by paying was satisfying two obligations of the contractor: one to the laborers and materialmen who were general creditors; the other to the United States, which was a preferred creditor "because of its possession of funds which could be used as an offset against the contractor. By satisfying the latter obligation, the plaintiff surety became entitled to be subrogated to the security which the United States held, i. e., the funds in its hands." The problem in the *Continental Casualty Company* case was in determining the priorities of the claim of the

---

2. United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947).

surety and the claims of the other creditors of the general contractor. That case did not involve a claim that a subcontractor was entitled to recover on the general contractor's performance bond. The court explicitly granted the surety priority on the theory that by satisfying an obligation of the general contractor to the United States, the surety was subrogated to the rights of the United States to the withheld funds in the possession of the United States. It nowhere suggested that the *subcontractor* was subrogated to the rights of the United States to those withheld funds.

Nor did Pearlman v. Reliance Insurance Co., supra, so declare. That case held that the materialman or subcontractor was entitled to funds withheld from the general contractor because of the general contractor's failure to pay the subcontractor, but did not say that that result was because the subcontractor was subrogated to the rights of the United States.

■ The present case does not involve a claim to withheld funds. This difference is significant because withheld funds are peculiarly related to the failure of the general contractor to pay the subcontractor; a performance bond, on the other hand, is not so directly related to that failure. The withheld fund is created because of the failure; the performance bond existed before the failure and its wording gives no impression that it was given in contemplation of a possible failure to pay suppliers. The principle of the *Continental Casualty Company* case and the *Pearlman* case does not become activated with respect to a performance bond. Additionally, the claim in the present case is not by a surety, but by a subcontractor. This fact is of importance, as pointed out in *Brezina*. The doctrine of subrogation involves the use of the property of one person to discharge the debt of another.[3] The subcontractor has not discharged the debt of another. At most it has discharged its own obligation to the gener-

al contractor. It, as a creditor of the general contractor, does not thereby become subrogated to rights of another creditor, the United States, merely because the obligation of the general contractor may run in two directions—to the subcontractor and to the United States. The plaintiff has cited no case and the court has found none holding to the contrary, unless the *Kalady* case be so interpreted.

The *Pearlman* decision contained both the distinguishing factors already mentioned: (1) a surety was the one seeking relief, rather than a supplier of labor and material, and (2) a fund specifically withheld because of nonpayment of materialmen was sought, rather than, as here, a performance bond. While the court in *Pearlman* said that "the laborers and materialmen had a right to be paid out of the fund," nothing in the opinion indicated that the rights of the laborers and materialmen arose because they were subrogated to the rights of the United States to the withheld funds and, of course, did not declare that the laborers and materialmen were entitled, by subrogation or otherwise, to other rights of the United States, such as benefits under a performance bond.

Rather than analyzing the present case in terms of subrogation, it seems more appropriate to analyze it in the terms of a third-party beneficiary contract, whereby the central issue becomes, as earlier stated, whether it was intended by the parties to the performance bond that the subcontractor was to benefit from it.

■ The Restatement of the Law of Security, § 166, p. 461, states:

"Where a surety guarantees the performance of a contract by a contractor who does not promise the owner to pay those furnishing labor or materials but agrees to complete the work free of liens or to furnish labor and materials, laborers and materialmen have no rights against the surety."

---

3. Restatement of the Law of Security, § 141, p. 383.

The rationale of the rule is stated in terms of intent, as follows:

"\* \* \* (I)f the surety has only guaranteed the contractor's promise to complete a construction project free of liens or to furnish labor and materials, there is no right in laborers or materialmen because there is no indicated purpose to benefit them. \* \* \* If the surety is to be made liable to third persons his obligation must contain a promise which may be reasonably interpreted as for their benefit."

The Nebraska Annotation to the Restatement of the Law of Security, § 166, suggests that early Nebraska cases, appearing to be contra, were rested on a public policy to protect laborers and materialmen in view of the lack of attachment of liens to public structures. I doubt the applicability of these early Nebraska cases to Miller Act cases, because it would seem preferable to apply federal law to federally required provisions of contracts,[4] and because the public policy sought has been protected by other means under the Miller Act, as hereinafter discussed.

As I interpret the *Brezina* case, the Eighth Circuit Court of Appeals stands by the rule set out in the Restatement, as hereinbefore quoted, but creates an exception in those instances in which the general contractor—or, by extension, the owner in construction contracts like the present one—is liable for labor and material furnished by another. That exception is not applicable in the present case because the United States is not liable for payment to the subcontractor. It also must be kept in mind that no payment bond for the protection of the suppliers of labor and material had been given in the *Brezina* case, so a need for finding other protection for them was

greater than where, as here, a payment bond exists. The desirable public policy of protecting laborers and materialmen who are not protected by a lien or a duty on the part of the owner to pay was directly considered and amply achieved by Congress in the passage of the Miller Act. In United States v. Munsey Trust Co., 332 U.S. 234, 241, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947), the court said:

"\* \* \* But nothing is more clear than that laborers and materialmen do not have enforceable rights against the United States for their compensation. \* \* \* They cannot acquire a lien on public buildings \* \* \*, and as a substitute for that more customary protection, the various statutes were passed which require that a surety guarantee their payment. Of these, the last and the one now in force is the Miller Act \* \* \*."

The Miller Act by § 270a(a) requires that on any contract for public work of the United States the contractor must furnish to the United States:

"(1) A performance bond \* \* \* for the protection of the United States \* \* \*.

"(2) A payment bond \* \* \* for the protection of all persons supplying labor and material in the prosecution of the work \* \* \*."

By § 270b every person who has furnished labor or materials in the prosecution of the work is given the right to sue on such payment bond. Nothing in the wording of the act gives to the one who furnished labor or material any right to sue on the performance bond. If Congress had intended *both* bonds to be for the protection of persons supplying labor and material, it easily could have said so.

4. An excellent discussion of the applicability of state law in interpreting Miller Act cases by Richard W. Smith, one of the counsel in the present case, appears in the Proceedings, 1963, Section of Insurance, Negligence and Compensation Law of the American Bar Association, p. 83. The conclusion is that the Supreme Court of the United States in the *Pearlman* decision was "reaching, in spite of Erie R.R. v. Tompkins for a federal general common law *applicable in those areas* where uniformity of decisional substantive law appears to be desirable \* \* \*."

I am persuaded that the conclusion now reached, which is that a subcontractor who furnishes labor and material is not entitled to recover on a Miller Act performánce bond, is not at odds with the intent of Congress in passing the Miller Act. Contrary to the suggestion in the plaintiff's brief and stated by the court in United States for Use of Edward Hines Lumber Co. v. Kalady Construction Company, supra, limiting such subcontractors to recovery on the payment bond does not make the " 'two-halves'—the two bonds—less than the whole bond it had been under the Heard Act." Two reasons are compelling:

First, the Heard Act[5] did not provide any minimum for the amount of the bond, requiring only that it be "the usual penal bond" with good and sufficient sureties, with the additional obligation that "such contractor * * * shall promptly make payments to all persons supplying him or them with labor and materials in the prosecution of the work * * *." and stated, "(I)f the full amount of the liability of the surety on said bond is insufficient to pay the full amount of said claim and demands [of persons supplying labor and materials], then, after paying the full amount due the United States, the remainder shall be distributed pro rata among [the persons who supplied labor and materials]." The Miller Act requires a performance bond in such amount as the officer awarding the contract shall deem adequate and a payment bond in the sum of one-half the total amount payable by the terms of the contract, where the amount payable is not more than $1,000,000.00.[6] Furthermore, the Miller Act provides that it shall not be construed to limit the authority of the contracting officer to require other security in addition to those specifically mentioned. The total amount of the two bonds required under the Miller Act may exceed, therefore, the amount of the single bond required under the Heard Act. Beyond this, the Heard Act specifically limited the suppliers of labor and material to whatever remained after the United States was satisfied in full. The Miller Act, on the other hand, gives to the suppliers of the labor and materials the full amount of the payment bond, which will amount to at least one-half the full contract price, and more if the contracting officer requires further security for them. The amount actually recoverable under the payment bond may well be in excess of the amount recoverable by the suppliers of labor and materials under the one bond required by the Heard Act.

Second, the Heard Act gave the suppliers of labor and material no right to initiate suit on the bond until six months from the completion and final settlement of the contract, except that they could intervene in any action instituted by the United States on the bond. The Miller Act permits the suppliers of labor and material to sue on the payment bond 90 days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him, thus accelerating substantially the time in which he could enforce his rights under the bond.

The legislative history of the Miller Act reflects that the purpose was to reduce delay in enforcement of the subcontractors' rights. The report of the House of Representatives Committee on the Judiciary of June 19, 1935,[7] states:

" * * * After considerable complaint with regard to the working of the Heard Act had come to the Committee on the Judiciary, particularly from subcontractors who have experienced in many cases what seems to

---

5. Act of August 13, 1894, c. 280, 28 Stat. 278, as amended by Act of February 24, 1905, c. 778, 33 Stat. 811, 40 U.S.C. § 270.

6. Although the full contract is not before the court, it appears from the briefs that probably the amount payable under the full contract in the present case is not more than $1,000,000.00.

7. H.Rep.No.1263 (74th Cong., 1st Sess.), p. 1.

your committee to be undue delay, with resultant hardships, in the collection of moneys due them by suits on bonds under the procedure prescribed by the Heard Act, the committee appointed a subcommittee to consider all of a number of proposed amendments * * *

"The Treasury Department expressed its accord with the purpose sought to be accomplished, in the following language * * * :

'The major purpose of the bill seems to be to afford greater protection to subcontractors, laborers, and materialmen by shortening the period within which action may be instituted by them against the surety. With this purpose the Treasury Department is fully in accord, as there have been many instances in which several years have elapsed after the performance of the work before a judicial remedy was available under the existing law.' "

Acceleration of right of action is not a hollow procedural change. Receiving payment swiftly has distinct economic benefits of which Congress was well aware.

In footnote 9 of the opinion in MacEvoy Co. v. United States, 322 U.S. 102, 109, 64 S.Ct. 890, 88 L.Ed. 1163 (1944) the court recites the following legislative history:

"Rep. Miller stated in the House that 'This bill merely provides that in the construction of public buildings and other public works there shall be two bonds, one for the performance of the contract with the Government, and the other a payment bond for the protection of subcontractors and those furnishing the labor and material. Under the present law we have but one bond, with a dual obligation, but it is not satisfactory in that it does not afford protection to the subcontractors, materialmen, and laborers. This merely provides for two bonds, one for the protection of the Government's interests, and the other for the protection of the rights of labor, the subcontractors, and material furnishers.' "

If Representative Miller meant that the act provides for *two* bonds for the protection of the rights of labor, the subcontractors, and material furnishers, *one* of which is to be also for the protection of the government, he could hardly have selected less appropriate language than he did for the expression of that intent. Moreover, it is difficult to believe that the framers of the Miller Act would give to the suppliers of labor and materials rights on the performance bond without mentioning the subject of priorities between those suppliers and the United States, a subject so specifically covered by the wording of the Heard Act.

Neither the Miller Act nor the history of its passage mirrors an intent that suppliers of labor and material should have rights under the performance bond. In order to hold that the parties to the performance bond and the contract referred to in it intended that the suppliers of labor and material were to be beneficiaries of the performance bond, a clearer expression of it should exist than appears in the documents here involved.

Accordingly, the motion of Ardelt-Horn Construction Co. to dismiss the complaint and the motion of St. Paul Fire & Marine Insurance Company to dismiss and to strike will be sustained as to the third claim for relief.

A separate order will be entered in accordance with this opinion.