GENERAL ELECTRIC CAPITAL
CORPORATION, Appellee,

v.

FORD MOTOR CREDIT COMPANY,
Appellant.

Civ. No. 92–245–P–C.

United States District Court,
D. Maine.

Dec. 15, 1992.

Memorandum on Reconsideration
Jan. 13, 1993.

John B. Cole, Auburn, ME, for appellee.

Gerald F. Petruccelli, Petruccelli, Cox & Martin, Portland, ME, for appellant.

## MEMORANDUM OF DECISION AND ORDER VACATING IN PART AND AFFIRMING IN PART THE DECISION OF THE BANKRUPTCY COURT GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

The Court has before it an appeal from a decision of the Bankruptcy Court[1] granting summary judgment for Plaintiff General Electric Capital Corporation ("GECC") on its Complaint dated July 3, 1991, against Ford Motor Credit Company ("FMCC"). The Complaint contains four Counts, encompassing two distinct disputes. Counts I and II seek a determination of the extent and priority of liens in relation to a contract for release of UCC-based security in-

---

1. On August 27, 1990, Jolly John Ford–Lincoln–Mercury, Inc., *et al.* (the "Dealerships") filed a petition for relief under Chapter 11 of the Bankruptcy Code. On May 7, 1991, the case was converted to a Chapter 7 case. Counts I and II of GECC's Complaint are core proceedings as defined by 28 U.S.C. § 157(b)(2)(K). Counts III and IV entail issues that are not core proceedings, but which otherwise are related to the Bankruptcy case because resolving these issues will determine, in part, whether the Dealerships are liable to GECC for amounts received when FMCC paid the Dealerships. *See* 28 U.S.C. § 157(c)(2). The parties agreed to have the Bankruptcy Court enter final judgment on all issues, core and non-core.

terest filings ("filings release contract") entered into by GECC and FMCC on November 18, 1988. Counts III and IV seek a determination of whether FMCC's payment to the Jolly John Dealerships (the "Dealerships") of sums in satisfaction of the GECC floor-planning liens relieves FMCC of liability to GECC for those sums. The Bankruptcy Court granted GECC's Motion for Summary Judgment on Counts I and III, and found that, because of its decision, Counts II and IV were moot. Memorandum of Decision (Docket No. 23) at 21.

## I. STANDARD OF REVIEW

■ A District Court, sitting in review, considers a Bankruptcy Court's decision to grant summary judgment *de novo*. *In re Two "S" Corp.*, 875 F.2d 240, 242 (9th Cir.1989). This standard is applicable to core proceedings, as well as non-core proceedings heard by the Bankruptcy Court by the consent of the parties. *See* Collier, *Bankruptcy Manual*, ¶¶ 3.01[2][d], 3.03[7] (3d ed. 1992). The standard for granting summary judgment in an adversarial bankruptcy proceeding is the same as provided for by Rule 56(c). *See* Fed.R.Civ.P. 56(c); Fed.R.Bankr.P. 7056.

A motion for summary judgment must be granted if "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court of Appeals for the First Circuit has aptly articulated the legal standard to be applied in deciding motions for summary judgment:

> [T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 [106 S.Ct. 2548, 2554, 91 L.Ed.2d 265] (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent*,

523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904 [96 S.Ct. 1495, 47 L.Ed.2d 754] (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson*, 477 U.S. at 248 [106 S.Ct. at 2510]; *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial', *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or significantly probative, summary judgment may be granted.

> *Anderson*, 477 U.S. at 249–50 [106 S.Ct. at 2511].

*Brennan v. Hendrigan*, 888 F.2d 189, 191–92 (1st Cir.1989).

## II. FACTS—COUNTS I AND II

Prior to November 18, 1988, FMCC enjoyed an extensive lending relationship with the Jolly John Dealerships located in Saco, Maine. Specifically, as of November 18, 1988, FMCC provided the following types of financing to the Dealerships:

(1) Floor plan wholesale inventory financing for new and used vehicles acquired by these Dealerships and held for resale to the public;

(2) Wholesale lease financing, whereby the Dealership would purchase vehicles for lease to retail leasing customers;

(3) Retail financing, whereby FMCC would provide financing for retail customers of the Dealerships.

McGuire Aff. (Docket No. 19) ¶ 3. During the fall of 1988, John Pulsifer, President of

the Dealerships, requested that GECC consider providing wholesale inventory financing and working capital financing to the Dealerships. Marinaro Aff. (Docket No. 11) ¶ 5. Thereafter, GECC entered into negotiations with the Dealerships regarding replacing FMCC as inventory financier and lending additional working capital. Marinaro Aff. ¶¶ 5–7. The terms of the financing were negotiated and agreed upon by the Dealerships and GECC.[2] Marinaro Aff. ¶ 5. GECC was to take over inventory financing from FMCC and, in addition, would loan the Dealership $500,000 for working capital. In October 1988, Pulsifer notified FMCC that he intended to terminate his wholesale inventory financing relationship with FMCC and switch it over to GECC. McGuire Aff. ¶ 5.

On November 18, 1988, James A. Marinaro, a representative of GECC, met with George T. McGuire, a representative of FMCC, at the Dealerships to work out the terms of GECC's switch of the wholesale inventory line of credit then carried by FMCC. McGuire informed Marinaro that FMCC could not provide termination statements or releases with regard to its UCC financing statements against the Dealerships' assets until the accounts and inventory had been reconciled.[3] McGuire Aff. ¶ 7; Marinaro Aff. ¶ 7. Because the reconciliation could not be accomplished that afternoon, Marinaro advised McGuire that GECC was unwilling to advance the funds necessary to pay off the FMCC floor plan unless it received some assurance that FMCC would file the releases. In an effort to obtain that assurance, GECC presented FMCC with an agreement, prepared by GECC's counsel, providing the conditions for the release of the filings. *See infra* at 234. The agreement was later signed by

McGuire on behalf of FMCC. McGuire Aff. ¶ 10.

GECC contends that the contract unambiguously calls for the release of *all* UCC filings FMCC has relating to the Dealerships' assets in return for the Dealerships' payment of floor plan obligations to FMCC. FMCC, on the other hand, maintains that the terms of the agreement require only the release of its filings for liens securing floor-planned inventory. The Bankruptcy Court found that the contract unambiguously "calls for a release of all filings in return for payment of only floor plan obligations" and granted GECC's Motion for Summary Judgment on Count I. Memorandum of Decision (Docket No. 23) at 12.

## III. DISCUSSION

FMCC's attack on the Bankruptcy Court's decision is threefold. First, FMCC argues that the Bankruptcy Court omitted to make the threshold determination whether the filings release contract was integrated. FMCC further claims that if the Court considers that issue it will find that the agreement is not integrated. Finally, FMCC contends that the Bankruptcy Court erred by concluding that the filings release contract is unambiguous. This Court agrees with the first and third of FMCC's contentions, but disagrees with the second.

### A. *Integration*

The parol evidence rule excludes from judicial consideration extrinsic evidence offered to vary, add to, or contradict unambiguous contractual language.[4] *Waxler v. Waxler,* 458 A.2d 1219, 1224 (Me. 1983); *Astor v. Boulos Co.,* 451 A.2d 903, 905 (Me.1982). This proposition, however, presupposes the existence of an integrated

---

**2.** The negotiations between the Dealerships and GECC did not involve FMCC, and contact between GECC and FMCC during the negotiations period was limited to credit information requests and responses. The precise nature of the credit information requests is not explained in the record.

**3.** FMCC was unable to reconcile the amounts due and owing to it on the floor-planned wholesale inventory units which GECC proposed to pay off that day because there were many collat-

eralized units in transit to the Dealership and units in the process of being purchased by retail customers.

**4.** Both parties agree that the interpretation of the contract in question is controlled by Maine law. FMCC's Memorandum in Opposition to Motion for Summary Judgment (Docket No. 18) at 8; GECC's Memorandum in Support of Motion for Summary Judgment (Docket No. 9) at 7.

contract. Whether the agreement is integrated is a question to be determined by the court. *Restatement (Second) of Contracts* §§ 209 comment c and 210(3); *see also Business Credit Leasing Inc. v. Biddeford,* 770 F.Supp. 35, 39 (D.Me.1991) (The District Court, considering the Magistrate Judge's recommended decision, found it necessary to make the threshold determination of whether the contract was integrated.). In this case, the Bankruptcy Court did not make a specific determination regarding the integration status of the contract. Therefore, this Court must determine whether the filings release contract is integrated before it can address the issue of its interpretation.

■■■ An "integrated" writing is one that contains the final and complete expression of the parties with respect to any term of their agreement. In determining whether a writing is integrated, the court may resort to evidence of agreements and negotiations of the parties preceding the written contract, *Astor,* 451 A.2d at 905, or to the mutual understandings of the parties at the time of entering into the contract. *Loe v. Thomaston,* 600 A.2d 1090, 1092 (Me.1991) (citing *Interstate Indus. Uniform Rental Serv., Inc. v. F.R. LePage Bakery, Inc.,* 413 A.2d 516, 519 (Me.1980)); *Harriman v. Maddocks,* 518 A.2d 1027, 1030 (Me.1986); *Connell v. Aetna Life & Casualty Co.,* 436 A.2d 408, 412 (Me.1981). A contract is presumed to be integrated "unless it is established by other evidence that the writing did not constitute a final expression." Restatement (Second) of Contracts § 209(3). FMCC asserts that the affidavits and deposition transcripts of record will show that the contract is not integrated.

■■ On this *de novo* review, the Court has examined the affidavits and depositions submitted by both parties and concludes that the filings release contract is fully integrated. The essence of FMCC's argument is that the document it signed does not reflect the parties' previous oral agreements. FMCC points to prior oral agreements, the terms of which are inconsistent with, but not additional to, the terms covered by the written contract. McGuire Aff.

¶¶ 8–13; Marinaro Aff. ¶¶ 7–9. These oral agreements are not probative on the issue of integration. The affidavits and depositions demonstrate without controversy that the agreement included only those matters contained in the writing; thus, the scope of the parties' agreement with respect to filing releases is fully represented by the contract. Given the present record, this Court is satisfied that the contract drawn up by GECC is an integration of the entire agreement between FMCC and GECC concerning the release of the financing statements.

### B. *Existence of an Ambiguity in the Contract*

Next, FMCC contends that the Bankruptcy Court erred by ignoring the second sentence of the filings release contract when determining its meaning. As a result, FMCC contends, the Bankruptcy Court failed to discover a material ambiguity present in the contract. FMCC's Brief at 15. This Court agrees with FMCC that the Bankruptcy Court failed to consider the ambiguous portion of the contract.

■■■ The standards for determining the existence of ambiguity in a contract are well established under Maine law.

The issue of whether contract language is ambiguous is a question of law for the Court. The interpretation of an unambiguous written contract is a question of law for the Court; the interpretation of ambiguous language is a question for the factfinder. The interpretation of an unambiguous writing must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence. Once an ambiguity is found then extrinsic evidence may be admitted and considered to show the intention of the parties.

*Portland Valve, Inc. v. Rockwood Systems Corp.,* 460 A.2d 1383, 1387 (Me.1983) (citations omitted). The intention of the parties is to be ascertained from an examination of the whole instrument. *Peerless Ins. Co. v. Brennon,* 564 A.2d 383, 385 (Me.1989); *Swift v. Patrons Androscoggin Mutual*

*Fire Ins. Co.*, 125 Me. 255, 256, 132 A. 745, 746 (1926). Moreover, the intention of the parties to a contract must be gathered from the writing construed with an eye to the subject-matter, the motive and purpose of making the agreement, and the object to be accomplished. *Monk v. Morton*, 139 Me. 291, 30 A.2d 17 (1943).

■■■ The application of these accepted principles to the contract initially requires consideration of the language of the contract in respect to the release of UCC filings to determine whether there exists an ambiguity which requires resort to extrinsic evidence to show the intention of the parties when they executed the agreement. The contract provides in its entirety:

TO: GENERAL ELECTRIC CAPITAL CORPORATION

FORD MOTOR CREDIT COMPANY AGREES TO RELEASE ALL UNIFORM COMMERCIAL CODE FILINGS THAT IT HAS FILED AGAINST:

ATLANTIC FORD, INC.

ATLANTIC SUBARU, INC.

ATLANTIC VW, INC.

ATLANTIC LINCOLN–MERCURY, INC. OF SACO, MAINE

IN EXCHANGE FOR PAYMENTS IN FULL, WITH GOOD FUNDS BY GE CAPITAL, FOR CURRENT OBLIGATIONS OWED TO FORD MOTOR CREDIT UNDER THE TERMS OF THE EXISTING FLOOR PLANNING PROGRAM IT HAS WITH THE ABOVE NAMED CORPORATIONS. FORD MOTOR CREDIT AGREES TO RELEASE EACH FILING, INDIVIDUALLY, AS OBLIGATIONS AGAINST CORPORATION ARE PAID IN FULL.

ACCEPTED

/s/ George T. McGuire

FORD MOTOR CREDIT COMPANY

Marinaro Aff. (Docket No. 11) ¶ 8; Marinaro Aff. Ex. A. The contract is made up of

two sentences. The first sentence commits FMCC to release all UCC filings for payment of floor-planned vehicles. The second sentence specifies when FMCC is required to release "each filing." FMCC is required "to release *each filing, individually,* as obligations against [the Dealerships] are paid in full." This sentence of the contract is ambiguous because, *inter alia,* it is unclear what assets are included as part of "each filing." Consequently, the Court is unable to determine which asset or assets should be released for payment of the floor-planned inventory.

Contract language is ambiguous when it is reasonably susceptible to different interpretations, *American Policyholders Ins. Co. v. Kyes,* 483 A.2d 337, 340 (Me.1984), and there are at least two possibilities of what is included in "each filing." First, there may be just one filing covering the floor-planned inventory, as well as the other assets of each dealership. If this is the case, it seems reasonable to conclude that the parties intended FMCC to release *all* its UCC filings, *including filings on assets other than floor-planned inventory,* as GECC paid off the obligations owed by that Dealership under the floor-planning program. On the other hand, there may be filings for floor-planned inventory and separate filings for other assets of the Dealerships. If this is the case, it seems reasonable to conclude that by including the second sentence the parties intended FMCC release *only the filings on floor-planned inventory* as GECC paid off the obligations owed by that Dealership under the floor-planning program. As a result, FMCC could release "each filing, individually, as obligations against [the Dealerships] are paid in full." [5]

■■■ It is well settled that meaning must be given to all clauses of a contract. *See Salmon Lake Seed Co. v. Frontier Trust Co.,* 153 A. 671, 130 Me. 69 (1931). Furthermore, all parts and clauses must be considered together so that it may be seen if and how far one clause is explained, modified, limited or controlled by the oth-

---

5. To the extent that the word "obligations" is not already ambiguous, it becomes ambiguous when the ambiguity in "each filing" is pointed out.

ers. *Monk,* 139 Me. 291, 30 A.2d 17. If the financing statements for floor-planned inventory are separate from the financing statements for other Dealership assets, the contract does not address when, if ever, the parties intended FMCC to release the financing statements on Dealership assets other than floor-planned inventory.[6] Therefore, the second sentence would limit the language of the first sentence, providing for the release of *"all* filings," to provide for the release of *only those filings relating to floor-planned inventory.* Because the Court finds an ambiguity in a material term of the contract, it is for the factfinder to determine, by way of parole evidence, whether it was the intent of the parties to circumscribe the filings to be released. *See Palmer v. Nissen,* 256 F.Supp. 497 (D.Me.1966).[7]

▮▮▮▮ The Bankruptcy Court had before it evidence of the parties negotiations prior to signing the contract. It is in dispute which filings the parties agreed to release. Marinaro contends that he discussed with FMCC the need for termination statements terminating *all* FMCC's UCC filings with regard to all the Dealerships' assets.[8] Marinaro Aff. ¶ 7. McGuire, on the other hand, asserts that he agreed to terminate FMCC's security interests in wholesale vehicle inventory as payment was received in full *for that inventory* from GECC. Moreover, McGuire contends that he never indicated to Marinaro that FMCC would be willing to discharge UCC filings in any property *other than wholesale vehicle inventory.*[9] McGuire Aff. ¶¶ 7–13. In light of the contradictory statements, there is a genuine issue of fact as to whether the parties intended all FMCC's filings against the Dealerships' assets to be released, or only those filings relating to the floor-planned inventory. *See Space Master Int'l, Inc. v. Worcester,* 940 F.2d 16, 19–20 (1st Cir.1991); *Computer Systems of America, Inc. v. International Business Machines Corp.,* 795 F.2d 1086, 1090–91 (1st Cir.1986).[10] The grant

6. In other words, it is unclear how "each filing" could be released *"individually,"* as obligations owed by the Dealerships are paid in full, if GECC were not paying off the debt that the security agreement and financing statement secure.

7. Disputes over the substance of negotiations presents a classic issue for the factfinder. *See* C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* § 2730.1 at 286–88 & n. 19 (2d ed. 1983). On remand, the factfinder should receive and consider only that evidence which has a legitimate tendency to show the intent of the parties when the contract for the release of UCC filings was signed.

GECC incorrectly argues that the factfinder can not consider the evidence of negotiations between FMCC and GECC that are materially different from or contradict the terms of the subsequent written contract. GECC's Brief at 16. Although it is true that evidence of prior negotiations is inadmissible to the extent that it is inconsistent with a subsequent written term, *Luce v. Park Street Motor Corp.,* 123 Me. 169, 122 A. 338 (1923); *see also* Restatement (Second) on Contracts § 215 ("where there is a binding agreement, either completely or partially integrated, evidence of prior or contemporaneous agreements or negotiations is not admissible in evidence to contradict a term of the writing"), this only applies to unambiguous contracts. Because the contract at issue in this case is ambiguous, extrinsic evidence may be admitted to determine the manifest intent of the par-

ties. Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish the meaning of the writing. *See* Restatement (Second) of Contracts, § 214 at 132–33.

8. In addition, Marinaro contends that he made clear to the Jolly John Dealerships that GECC would require a broad filing (i.e. a perfected first priority security interest in *all* assets of the Dealerships). Marinaro Aff. (Docket No. 11) ¶ 7. FMCC contends that at no time prior to the closing on November 18, 1988, did GECC indicate that it would require a broad filing. To the contrary, FMCC contends that through Marinaro, GECC indicated that it wanted only a first priority security interest in the wholesale inventory, the financing of which was being taken over on November 18, 1988, by GECC from FMCC. McGuire Aff. (Docket No. 19) ¶ 8; Lebreux Aff. ¶¶ 3, 5.

9. FMCC held a security interest in the Dealerships furniture, fixtures, machinery, supplies, and other equipment, all accounts, contract rights, chattel paper and general intangibles, and in all credits due and to become due to Ford Motor Company or any of its subsidiaries or affiliates. McGuire Aff. (Docket No. 19) Ex. A, B, C, D, E, F.

10. Ambiguous contracts do not always present an issue of fact which precludes summary judgment. In situations where the evidence present-

of GECC's Motion for Summary Judgment on Count I was error.

## IV. FACTS—COUNTS III AND IV

Counts III and IV are based on a dispute over FMCC's liability for four sight drafts with which FMCC made payment to the Dealerships, rather than GECC. The drafts were drawn by the Dealerships, under FMCC's authority, against FMCC's account with Mellon Bank, N.A., and were payable to GECC.

As previously described, in November of 1988 GECC became the primary supplier of credit to the Dealerships. At the closing of the agreement to supply credit, the Dealerships delivered executed security agreements granting security interests to GECC in, among other things, all inventory, new and used. In late June of 1989 the Dealerships executed a mortgage and security agreement securing the Dealerships' obligations to GECC. Sometime later, the Dealerships assigned the proceeds of all the conditional sales contracts to GECC. Thus, in July 1990 GECC requested FMCC pay it directly, and thereafter FMCC made the sight drafts payable to GECC. GECC's Statement of Material Facts (Docket No. 10) ¶ 11; FMCC's Statement of Facts (Docket No. 21) ¶ 12; FMCC's Memorandum in Opposition (Docket No. 18) at 6; Marinaro Aff. (Docket No. 11) Ex. H.

FMCC continued to finance vehicle sales to some of the Dealerships' customers. In such cases, the procedure for authorizing the extension of credit to car buyers was handled by FMCC. In each case, whether directly or indirectly, GECC would be paid in satisfaction of its floor plan lien on the vehicles. With each sale, the Dealerships took the purchaser's application for retail financing and submitted it to FMCC for approval. If FMCC approved the application, it would authorize the dealer to complete the loan financing arrangements with the customer. Completing the loan entailed securing a promissory note and appropriate collateral documentation for the vehicle being sold and drawing a sight draft on the account of FMCC at Mellon Bank, N.A., to pay for the vehicle. The sight draft represented an advance by FMCC on the customer's loan to purchase the vehicle.

Upon receipt of FMCC's authorization, the Dealerships would process the loan package and submit the completed loan package to FMCC. FMCC reserved the right to reject such loan packages and to dishonor sight drafts should they deem the loan package incomplete or deficient. FMCC dishonored the four sight drafts at issue here when it received what it deemed to be defective loan documentation from the Dealerships.

Neither party contests that GECC received the four sight drafts at issue, that GECC was the designated payee, that the drafts were the proceeds of sales of four vehicles subject to GECC liens, and that the drafts were subsequently dishonored and returned to GECC. The drafts were all dated prior to the August 27, 1990, filing date on the Chapter 11 petition.[11] The loan documentation was completed and accepted by FMCC sometime after August 27, 1990. FMCC then made good on the sums owed under the previously dishonored sight drafts *by directly paying the Dealerships* with checks written on September 20, 1990. FMCC's Statement of Facts ¶ 22. Thus, GECC, the payee on the previously dishonored sight drafts, was unpaid.

---

ed about the parties intended meaning to an ambiguous contract is so one-sided that no reasonable person could decide to the contrary summary judgment may be proper. *See Allen v. Adage, Inc.,* 967 F.2d 695, 698 (1st Cir.1992); *see also American First Invest. Corp. v. Goland,* 925 F.2d 1518, 1522 (D.C.Cir.1991) ("summary judgment may be appropriate in a contract case even if the contract is ambiguous so long as there is no evidence that would support a conflicting interpretation of the agreement").

**11.** The four sight drafts were dated and valued as follows:

| Sight Draft Number | Sight Draft Date | Sight Draft Amount |
| --- | --- | --- |
| 21700118 | August 20, 1990 | $ 9,276.36 |
| 21700119 | August 20, 1990 | 9,463.55 |
| 21700120 | August 22, 1990 | 8,376.00 |
| 21700122 | August 23, 1990 | 10,207.72 |

GECC claims that FMCC's later payment by check to the Dealerships fails to discharge FMCC's obligation under the dishonored sight drafts to pay GECC. FMCC contends that payment to the Dealership was sufficient to satisfy its obligation to GECC. Specifically, FMCC argues that the Cash Collateral Order, issued by the Bankruptcy Court on September 12, 1990, binds the parties, that the drafts constituted cash collateral, and that its payments to the Dealerships were in accord with the Cash Collateral Order.[12] The Bankruptcy Court agreed with GECC finding that the drafts did not fall under the Cash Collateral Order, and thus payment by FMCC to the Dealerships did not satisfy the obligations of FMCC to GECC. Accordingly, the Bankruptcy Court granted GECC's Motion for Summary Judgment on Count III.

## V. DISCUSSION

GECC, as assignee of the Dealerships' conditional sales contracts, requested that FMCC pay it directly, rather than continue to pay the Dealerships. GECC argues that after the initial dishonor, FMCC's payment to the Dealerships did not discharge FMCC's obligation to pay GECC under the request to pay direct, and thus FMCC remains liable to GECC. *See* 11 M.R.S.A. § 9–318(3). Section 9–318(3) of the Maine Commercial Code states:

> The account debtor is authorized to pay the assignor until the account debtor receives notification that the amount due or to become due has been assigned and that payment is to be made to the assignee. A notification which does not reasonably identify the rights assigned is ineffective. If requested by the account debtor, the assignee must seasonably furnish reasonable proof that the assignment has been made and unless he does so the account debtor may pay the assignor.

Payment by the account debtor, FMCC, to the assignor, the Dealerships, after being directed to pay the assignee, GECC, does not discharge FMCC's liability to the assignee.

FMCC argues that the Cash Collateral Order, issued by the Bankruptcy Court on September 12, 1990, binds the parties, that the drafts constituted cash collateral, and that its payments to the Dealerships were in accord with the Cash Collateral Order. The paragraph of the Order FMCC relies upon states:

> Ordered that not later than Monday, September 17, 1990, the Debtor shall provide to GECC and FMCC a complete statement of all transactions in any collateral from August 20, 1990, through the effective date of this order for the purpose of reconciling any discrepancies or misunderstandings concerning the status of the inventory as of the Filing Date and as of the date of the effectiveness of the order.

Cash Collateral Order (Docket No. 3) at 3.

The Cash Collateral Order pertains to what the Dealerships were required to do with cash collateral *it* received. The Order did not alter the respective rights and obligations of the account debtor, FMCC, and the accounts receivable assignee, GECC. FMCC was not required by the Cash Collateral Order to tender to the Dealerships the floor plan payoff amount. Moreover, the Cash Collateral Order does not govern these transactions which occurred pre-petition. The paragraph in the Order, relied upon by FMCC, does not require payment for any transaction occurring after August 20, 1990, to be made to the Dealerships. Rather, that paragraph simply directs the Dealerships to make a complete statement of all transactions that had occurred from August 20, 1990 (pre-petition) through the effective date of the order (post-petition).

---

12. For the first time on appeal, FMCC argues that it would be liable for damages for violating the automatic stay provision of the Bankruptcy Code if it had not made payment directly to the Dealerships. FMCC's Brief at 28. FMCC did not place the argument before the Bankruptcy Court in their response to GECC's Motion for Summary Judgment. Accordingly, this Court views the argument as having been waived. *See Arrieta–Gimenez v. Arrieta–Negron,* 859 F.2d 1033 (1st Cir.1988); *Johnson v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir.1979) (a legal theory not presented to the district court cannot ordinarily be raised for the first time on appeal).

Accordingly, it is ORDERED that the decision of the Bankruptcy Court granting General Electric Capital Corporation's Motion for Summary Judgment on Count I be, and is hereby, VACATED and REMANDED to the Bankruptcy Court for a determination of the contract's meaning in light of the ambiguity. It is FURTHER ORDERED that the Bankruptcy Court's decision on Count III be, and is hereby AFFIRMED.[13]

SO ORDERED.

## FORD MOTOR CREDIT COMPANY'S MOTION FOR RECONSIDERATION

Ford Motor Credit Company (FMCC) requests this Court to reconsider its Memorandum of Decision and Order affirming the Bankruptcy Court's grant of Summary Judgment on Counts III and IV of General Electric Capital Corporation's (GECC) Complaint in this adversary proceeding. FMCC requests consideration for the following reasons: 1) the Court misapprehended the effect of the Cash Collateral Order on the four sight-draft transactions; and 2) the Court misquoted the tenth paragraph of the Cash Collateral Order, relied upon by FMCC to support its argument. The Court hereby *GRANTS* FMCC's Motion to Reconsideration, but concludes that the arguments put forth do not change its prior decision on Counts III and IV.

The Court does not misapprehend the effect of the Cash Collateral Order on the sight drafts at issue in this case. The Cash Collateral Order did not require FMCC to pay the Dealerships for the sight drafts, as opposed to GECC the accounts receivable assignee. The Cash Collateral Order pertains to what the Dealership was required to do with cash collateral *it* received. The Order did not alter the respective rights and obligations of the account debtor, FMCC, and the accounts receivable assignee, GECC.

FMCC properly points out that the Court elided its quotation of the tenth paragraph of the Cash Collateral Order. The paragraph from the Order relied upon by FMCC states in full:

ORDERED that not later than Monday, September 17, 1990, the Debtor shall provide to GECC and FMCC a complete statement of all transactions in any collateral from August 20, 1990, through the effective date of this order *for the purpose of establishing the starting point for all transactions undertaken pursuant to this order and* for the purpose of reconciling any discrepancies or misunderstandings concerning the status of the inventory as of the Filing Date and as of the date of the effectiveness of this order.

(elision emphasized). The elided language does not change the Court's analysis regarding the effect of the Cash Collateral Order and does not represent any past misapprehension by the Court as to the proper legal effect of the content of the Order. Accordingly, on reconsideration the Court's Memorandum of Decision and Order affirming the Bankruptcy Court's grant of Summary Judgment on Counts III and IV of GECC's Complaint is AFFIRMED.[1]

SO ORDERED.

---

13. The Bankruptcy Court, in its Order concluded that Counts II and IV were moot "[i]n light of the relief granted on Counts I and III." Memorandum of Decision (Docket No. 23) at 21. This Court has difficulty assessing the precise effect that conclusion has in light of this Court's action. Accordingly, on remand, this Court believes the Bankruptcy Court should consider, with respect to Count II, whether that Count remains viable.

1. The Court is aware that this Order is issued prior to the expiration of Defendant's response time under Local Rule 19. The Court has concluded that there is no need to delay decision pending a response. No prejudice is caused to Defendant by the immediate decision.