**TRANSAMERICA PREMIER INSURANCE COMPANY, Plaintiff,**

v.

**Thomas J. OBER, et al., Defendants.**

**Civ. No. 93-342-P-C.**

United States District Court, D. Maine.

July 19, 1995.

---

James D. Poliquin, Anne M. Carney, Norman, Hanson & Detroy, Portland, ME, John V. Church, Robert F. Carney, Whiteford, Taylor & Preston, Baltimore, MD, for plaintiff.

Thomas J. Ober, Kennebunk, ME, pro se.

Thomas A. Dennison, East Orleans, MA, pro se.

Gerald F. Petruccelli, Petruccelli & Martin, Portland, ME, David H. Fromm, Chalos & Brown, New York City, for defendant Henry Marinet.

William H. Welte, Welte & Welte, Camden, ME, for defendant Local Towing Corp.

Michael X. Savasuk, Bradley & Savasuk, Portland, ME, Dante Mattioni, Stephen M. Martin, Mattioni, Mattioni & Mattioni, Philadelphia, PA, for defendant C & G Excavating Inc.

*MEMORANDUM AND ORDER GRANT-ING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

GENE CARTER, Chief Judge.

Plaintiff Transamerica Premier Insurance Company ("Transamerica") brings this interpleader action asking the Court to determine the proper distribution of the penal sum of a payment bond issued by Transamerica to East Coast Marine ("ECM") as a requirement of ECM's contract with the United States for a dredging project on the Saco River. Now before this Court is Transamerica's Motion for Partial Summary Judgment (Docket No. 115) which asks this Court to enter judgment as a matter of law on three matters: (1) whether Defendants Henry Marine Services ("Henry Marine") and C & G Excavating, Inc. ("C & G") are entitled to recover under the performance bond issued by Transamerica for the dredging project;[1] (2) whether Defendant C & G is entitled to recover a sum from the payment bond to cover the loss of a tender boat, a pipeline barge, and an amount of pipeline; and (3) whether any of the claimants are entitled to recover attorneys' fees from Transamerica.

The Court of Appeals for the First Circuit has recently explained once again the workings and purposes of the summary judgment procedure:

Summary judgment has a special niche in civil litigation. Its "role is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 794 (1st Cir.1992), *cert. denied* — U.S. —, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). The device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money, and permitting courts to husband scarce judicial resources.

A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)....

Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trial-worthy issue exists. *See National Amusements [v.],* 43 F.3d [731,] 735 [ (1st Cir. 1995) ]. As to issues on which the summary judgment target bears the ultimate burden of proof, she cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *See Garside [v. Osco Drug. Inc.],* 895 F.2d [46,] 48 [ (1st Cir.1990) ]. Not every factual dispute is sufficient to thwart summary judgment; the contested fact must be "material" and the dispute over it must be "genuine." In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. *See [United States v.] One Parcel [of Real Property with Buildings],* 960 F.2d [200,] 204 [ (1st Cir.1992) ]. By like token, "genuine" means that "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party...." *Id.*

When all is said and done, the trial court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor," *Griggs–Ryan [v. Smith],* 904 F.2d [112,] 115 [ (1st Cir.1990) ], but paying no heed to "conclusory allegations, improbable inferences, [or] unsupported speculation," *Medina–Munoz [v. R.J. Reynolds Tobacco Co.],* 896

---

**1.** Henry Marine and C & G have sought such a recovery through counterclaims filed by each of them in this action (Docket Nos. 88 and 89).

F.2d [5,] 8 [ (1st Cir.1990) ]. If no genuine issue of material fact emerges, then the motion for summary judgment may be granted.

... [T]he summary judgment standard requires the trial court to make an essentially legal determination rather than to engage in differential factfinding....

*McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 314–15 (1st Cir.1995). Accordingly, this Court will review the facts in a light most favorable to Defendants, who are the nonmoving parties here. A statement of the material facts, as presented to this Court on this motion, follows.

## I. MATERIAL FACTS

In 1992, the United States awarded a contract to ECM under which ECM would dredge certain parts of the Saco River in Maine. As required by the Miller Act, 40 U.S.C. §§ 270a–270d, ECM obtained two bonds, which were issued by Transamerica, to secure the project. The "payment bond" issued by Transamerica on behalf of ECM was issued for a penal sum of $324,794.50 and the "performance bond" was issued for a penal sum of $649,589.00.

C & G entered into a Bareboat Charter Party Agreement ("Charter Agreement") under which ECM would lease from C & G the dredge AMBER II, the tender boat LITTLE GEORGE, and, it is alleged, a pipeline barge, pipeline, and certain other equipment to be used on the project. ECM entered into a towage agreement with Defendants Henry Marine and EL/CAP Towing and Transportation ("EL/CAP") to tow the equipment leased from C & G from Delaware to Saco, Maine. As a result of two separate incidents, the pipeline barge, the tender boat, approximately 5500 feet of pipeline, and other equipment on these boats were lost at sea.[2] In addition, ECM defaulted on its agreement with C & G not only by failing to return the leased property in the condition in which it was delivered, but also by failing to pay for the charter hire and failure to repair the damage to the leased barge.

ECM failed to complete the dredging project[3] and did not fully pay its subcontractors and suppliers. Many of these subcontractors filed claims with Transamerica on the payment bond; the total amount of the claims exceeds the penal sum on the payment bond.[4] Transamerica brought this interpleader action, naming the claimants as defendants and seeking to deposit the penal sum of *the payment bond,* as it is presently calculated, with the Court to be distributed to the claimants and to be discharged from any further liability *on the payment bond.*

## II. DISCUSSION

In opposition to Transamerica's Motion to Fix the Amount of the Bond (Docket No. 3), C & G and Henry Marine claimed that they are entitled to recover, not only under the payment bond but under *the performance bond as well.* Although this Court granted, in part, Transamerica's Motion to Fix the Amount of the Bond by establishing the amount as the remaining penal sum on the payment bond (Docket No. 60), the Court also permitted C & G and Henry Marine to pursue their performance bond claims through counterclaims. Transamerica now seeks partial summary judgment on the counterclaims. Transamerica also seeks summary judgment against C & G on its claim for recovery for the loss of the tender boat, pipeline, and barge, arguing that such equipment constitutes "capital equipment" rather than "material" and, accordingly, that C & G cannot seek recovery for their loss under a Miller Act payment bond. Finally, Transamerica seeks summary judgment on the issue of whether C & G or any other

---

**2.** The parties dispute the cause of the loss and the manner in which liability should be apportioned among the parties. Resolution of this issue, however, will not prevent the entry of summary judgment by the Court on this particular motion.

**3.** Counsel for Transamerica represented to the Court that ECM defaulted on its contract with the United States and that Transamerica had paid another subcontractor to complete the dredging project.

**4.** A Miller Act surety's obligation is limited to the face amount of the bond in question. *Pennsylvania Fire Insurance Co. v. American Airlines, Inc.,* 180 F.Supp. 239, 241 (E.D.N.Y.1960).

party to the interpleader is entitled to attorneys' fees.

### A. The Performance Bond

■ Transamerica asserts that C & G, Henry Marine, and the other subcontractors and suppliers not paid by ECM are not entitled to any recovery on the performance bond and that any recovery they may have is restricted to the penal sum of the payment bond. The Miller Act, 40 U.S.C. §§ 270a–270d, specifies two different types of bonds that all prime contractors in certain government construction contracts must obtain:

(1) A performance bond with a surety or sureties satisfactory to the officer awarding such contract, and in an amount as he shall deem adequate, for the protection of the United States.

(2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person.[5]

40 U.S.C. § 270a(a).[6] The purpose of requiring payment bonds is to protect suppliers of material and labor who are unable to acquire a "mechanics' lien" against any government property at issue in the contract. *U.S. v. Munsey Trust Co.,* 332 U.S. 234, 241, 67 S.Ct. 1599, 1602–03, 91 L.Ed. 2022 (1947). The Miller Act replaced the Heard Act which had required prime contractors to obtain only one bond, which would secure both the payment of subcontractors and suppliers and the prime contractor's performance.

The small amount of case law in the district courts on the ability of a subcontractor or supplier to recover on a performance bond is essentially divided on the issue; two cases support recovery, and three reject it. In addition the Court of Appeals for the Eight Circuit has, on two occasions, held that subcontractors and suppliers may not recover under a Miller Act performance bond. The earliest case on this question, *U.S. ex rel. Hines Lumber Company v. Kalady Construction Co.,* 227 F.Supp. 1017 (N.D.Ill. 1964), concluded that the plaintiff there could recover the salaries of four laborers under the performance bond. Noting that courts have always applied a liberal interpretation to the Miller Act, the court concluded that "[b]y the circuitous route of 'reference by incorporation' the 'performance bond' could be deemed to cover the obligation to pay salaries." *Id.* at 1018. The route taken by the court was to note that in the contract between the United States and the prime contractor, the parties mutually agreed to perform the contract in "strict accordance" with certain "Labor Standards Provisions" provided pursuant to a statute. These provisions state that "[a]ll mechanics and laborers employed or working directly upon the site of the work will be paid unconditionally and not less often than once a week ... the full amounts due at time of payment." *Id.* at 1018–19.

The court considered the purpose of the revisions on bond requirements brought about by the enactment of the Miller Act to be to "enable laborers and materialmen to secure immediate relief where there was nonpayment for labor and materials and overcome their having to be postponed in their remedy as theretofore until after the United States was made whole." [7] *Id.* at

---

**5.** The statute provides that the amount of a payment bond is determined as a certain fraction of the value of the overall contract. 40 U.S.C. § 270a(a)(2). Here, since the total amount payable by the terms of the contract was under $1,000,000, the payment bond reflects one-half the total amount payable by the terms of the contract, or $324,794.50.

**6.** These two different bonds are also defined in the Code of Federal Regulations:

(e) A payment bond assures payments are required by law to all persons supplying labor or material in the prosecution of the work provided for in the contract.

(f) A performance bond secures performance and fulfillment of the contractor's obligations under the contract.

48 C.F.R. § 28.001(e) and (f) (1994).

**7.** Under the Heard Act, subcontractors and suppliers could not file any claims against the bond until the United States was "made whole" for any breach by the prime contractor. "The Government was given the sole right to sue on the bond for six months after completion of the work and final settlement. Other claimants could sue only thereafter and had to join in a single action." *Clifford F. MacEvoy Co. v. United States,*

1019. The court noted that the United States Supreme Court, when applying the Miller Act, has held that Congress did not repudiate the "equitable principles" of earlier cases applying the Heard Act when it enacted the Miller Act and that the Miller Act is "'highly remedial in nature [and] is entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go in to [sic] public projects.'" *Id.* at 1020 (quoting *MacEvoy v. U.S.*, 322 U.S. 102, 107, 64 S.Ct. 890, 893–94, 88 L.Ed. 1163 (1944)). Since part of the "performance" of the prime contract was to comply with the "Labor Standards Provision" and the prime contractor had violated the contract by failing to do so, the laborers' claims fell "within the obligations specified in the contract covered by the performance bond." *Id.* at 1021. Plaintiff's claims, therefore, addressed a failure to "perform" and since the payment bond proceeds were exhausted, the court held that the laborers should be able to obtain relief under the performance bond. *Id.*

In an interpleader action comparable to that brought here, the United States District Court for the District of Montana concluded that the subcontractors and suppliers could not recover under a performance bond. *Sun Insurance Company v. Diversified Engineers, Inc.*, 240 F.Supp. 606 (D.Mont.1965). The court reviewed the language of the statute and the summarized history of the Miller Act set out in an opinion of the Court of Appeals for the Second Circuit:

> 'The Miller Act worked two basic changes in [the law under the Heard Act]: the contractor was required to post two bonds, one protecting the government against failure to perform, the other protecting the subcontractor. The government, being safeguarded by the performance bond, had no direct interest on the payment bond. Each supplier of labor or material was permitted to institute a separate action to recover his claim.'

*Id.* at 608 (quoting *U.S. v. Aetna Casualty & Surety Co.*, 297 F.2d 665, 668 (2d Cir.1962)). The court in *Diversified Engineers* acknowl-edged that the Miller Act was entitled to liberal construction, but nonetheless stated that "such a salutary policy does not justify ignoring plain words of limitation," and that even if statutory language is inclusive, it should not apply to a matter that is addressed specifically in another part of the enactment. *Id.* at 609. Since the suppliers of labor and materials do not have an enforceable right against the United States for their compensation, they can only recover from the surety. *Id.* (citing *Munsey Trust*, 332 U.S. at 241, 67 S.Ct. at 1602–03). After distinguishing the cases relied upon in the *Kalady* decision, the court in *Diversified Engineers* concluded that "based upon the plain wording of the [Miller] Act and its legislative history I cannot escape the conclusion that the suppliers of material and labor are limited to recovery under the payment bond." *Id.* at 611. The court also observed that in other Miller Act cases addressing unrelated issues, the actions were brought to recover on the payment bond only. *Id.* at 609 n. 3.

Five years after *Diversified Engineers*, the United States District Court for the District of Nebraska tackled the same issue and also concluded that the subcontractor/claimant there could recover only under the payment bond. *U.S. ex rel. Simon v. Ardelt–Horn Constr. Co.*, 316 F.Supp. 254 (D.Neb.1970). The court considered the "pivotal issue" to be "whether the United States, the general contractor, and the surety intended that a supplier of labor and material under a subcontract be a beneficiary of the performance bond." *Id.* at 257. The court was unable to find any "clear hint at an intent that the materialmen would have rights under a performance bond." *Id.* at 258. The obligation of the prime contractor to "furnish" the labor and materials for a project does not necessarily mean that it is then obligated to the United States to pay others who supplied labor and materials as well. The court also stated that the problem is more appropriately analyzed in terms of a third-party beneficiary relationship than a subrogation situation; thus, the intent of the

322 U.S. 102, 107 n. 4, 64 S.Ct. 890, 893 n. 4, 88      L.Ed. 1163 (1944).

parties is relevant.[8] It also relied upon section 166 of the *Restatement of the Law of Security,* which states, vis-a-vis the guaranty of a contractor's promise to complete construction free of liens, that in the absence of an express promise to pay those furnishing labor and materials, "laborers and materialmen have no rights against the surety." *Restatement (First) of Security* § 166 (1941).

The court also examined the overall statutory scheme and noted: "Nothing in the wording of the [Miller Act] gives to the one who furnished labor or material any right to sue on the performance bond. If Congress had intended *both* bonds to be for the protection of persons supplying labor and material, it easily could have said so." *Ardelt–Horn,* 316 F.Supp. at 261. The court concluded that the result there, which denied recovery on the performance bond to the claimant, was consistent with the intent of Congress in the enactment of the Miller Act. The court quoted the Supreme Court's summary of the Miller Act's legislative history, which stated, in part, " '[The Miller Act] merely provides for two bonds, one for the protection of the Government's interests, and the other for the protection of the rights of labor, the subcontractors, and material furnishers.' " *Id.* at 263 (quoting *MacEvoy,* 322 U.S. at 109, 64 S.Ct. at 894). The court also pointed out that the statute's drafters could not have intended both the United States and subcontractors to recover under the performance bond since there is no mention of priorities, which had been addressed in the Heard Act. *Id.* Accordingly, since the parties did not expressly create a third-party beneficiary relationship, and the Miller Act did not authorize any recovery under the performance bond, no recovery was permitted.

The district court's decision in *Ardelt–Horn* was affirmed by the Court of Appeals for the Eighth Circuit in a brief *per curiam* decision. The appellate court adopted the "well-reasoned" and "well considered" opinion of the trial court and concluded:

> We agree with the view of the trial court that the Miller Act by its clear language, which is fully supported by the legislative history, provides for a payment bond for protection of those providing labor and material on government projects and a performance bond for the protection of the United States, and that no basis exists for plaintiff's claim as a third party beneficiary of the performance bond.

*U.S. ex rel. Simon v. Ardelt–Horn Constr. Co.,* 446 F.2d 820, 820–21 (8th Cir.1971), *cert denied,* 404 U.S. 1060, 92 S.Ct. 740, 30 L.Ed.2d 747 (1972).[9]

The United States District Court for the Southern District of Texas followed the reasoning of *Ardelt–Horn* in *United States Fidelity and Guaranty Co. v. A & A Machine Shop, Inc.,* 330 F.Supp. 1403 (S.D.Tex.1971). That case, as is this one, was one in which a

---

**8.** This Court notes that Transamerica has seized on the notion that the "intent" of the parties is the focus of consideration when analyzing a surety's obligation under these bonds and, accordingly, has provided this Court with three affidavits, each from an individual employed by an entity involved with the initial issuance of the bonds (Army Corps of Engineers, ECM, and Transamerica), stating that it was the intent of their respective employers that Transamerica be obligated to the subcontractors and suppliers on the payment bond only. The furnishing of this evidence appears to be in response to certain questioning by the Court during the June 1, 1994, hearing on Transamerica's Motion to Fix Amount of Bond (Docket No. 3) in this matter.

When interpreting any written contract, the intent of the contracting parties, *as expressed by the parties in the contract itself,* is certainly of paramount consideration to the reviewing court. Since "surety contracts are subject to the same rules of construction as other contracts," *In re Sinking of M/V Ukola,* 806 F.2d 1, 4 (1st Cir. 1986), this Court will not consider "extrinsic evidence offered to vary, add to, or contradict unambiguous contractual language." *General Electric Capital Corp. v. Ford Motor Credit Co.,* 149 B.R. 229, 232 (D.Me.1992) (applying Maine law). In this instance, the Court concludes that the language of the bonds here is not ambiguous and plainly permits recovery by subcontractors and suppliers under the payment bonds only. Accordingly, the Court has not considered any of the affidavits submitted by Transamerica on this issue.

**9.** The Court of Appeals for the Eight Circuit reasserted its holding in *Ardelt–Horn* three years later in *United States ex rel. Warren v. Kimrey,* 489 F.2d 339 (8th Cir.1974) and held in that case, "The performance bond here involved as written unambiguously makes the Government the sole obligee and contains no provision for the protection of building or material men [sic]." *Id.* at 343.

surety filed an interpleader after the total number of claims exceeded the value of the payment bond. Further, the defendant/claimants there filed a "cross-action" asserting that the surety was liable to them under the performance bond as well and the surety moved for partial summary judgment on the performance bond liability. *Id.* at 1404. The court there not only distinguished *Kalady* on its facts (since there was a "specific covenant requiring payment of mechanics and laborers with the performance bond conditioned on the fulfillment of all covenants" in the earlier case), but also rejected entirely the reasoning of the earlier case in favor of that in *Ardelt–Horn,* the rationale of which "much more closely effects the public policies sought to be furthered by the Miller Act." *A & A Machine Shop,* 330 F.Supp. at 1405–06.

The most recent case on this issue, *U.S. ex rel. Blount Fabricators, Inc. v. Pitt General Contractors, Inc.,* 769 F.Supp. 1016 (E.D.Tenn.1991), permitted recovery on the performance bond, under facts nearly identical to those here. The claim was brought by a subcontractor who was owed over $46,000 by the prime contractor and where the payment bond's penal sum was only $21,210.95. *Id.* at 1017. The claimant/plaintiff there successfully argued that it was the beneficiary of a third-party contract. The contract between the United States and the prime contractor included a provision by which the prime contractor, as a condition of receiving the final payment for the job from the United States, was required to submit a certification to the United States to the effect that it had made payments (and will make payments out of the final proceeds) to its suppliers and subcontractors. Although the prime contractor was paid in full by the United States, it, in fact, did not keep the promise to pay all of the subcontractors. *Id.* at 1018.

Although the court in *Pitt General Contractors* permitted recovery under the performance bond, it followed an approach

somewhat different from that seen in *Kalady.* The "critical question" under the court's analysis was whether or not the sureties, through the issuance of the performance bond, had guaranteed to the United States a promise by the prime contractor that the prime contractor would pay for labor and materials. The court concluded that such a promise was made and that the promise was guaranteed by the sureties since the performance bond stated that it will be void if the prime contractor, " '[p]erforms and fulfills *all* the undertakings, covenants, terms, conditions, and agreements of the contract....' " *Id.* at 1019 (emphasis added in original). The court also concluded that, unquestionably, the subcontractors and suppliers were the "intended beneficiaries [of] the promise"; the promise could not have been intended to benefit the United States since the government has no liability to the subcontractors and suppliers. *Id.* The court placed great reliance on section 165 of the *Restatement of the Law of Security* which addresses the guarantee of a promise by a prime contractor that it will pay its subcontractors and suppliers.[10] The court in *Pitt General Contractors* considered the opinion in *Ardelt–Horn* and, although ultimately arriving at a different outcome, followed the earlier case's approach. The *Pitt General Contractors* opinion focused on the language of the primary contract which, as discussed *supra,* required the prime contractor to make promises and representations to the United States that it had and would continue to pay its obligations under its subcontracts. *Pitt General Contractors,* 769 F.Supp. at 1019. According to the court, these promises created a third-party beneficiary relationship. The result was different from that in *Ardelt–Horn,* the court held, because the contract at issue in the earlier case did not contain a "clearer expression" that the subcontractors were intended beneficiaries: "*[Ardelt–Horn]* turns on what the documents stated as does this case. In the present case, I find that the

---

**10.** The Restatement provides, in part:

Where a surety for a contractor on a construction contract agrees in terms with the owner that the contractor will pay for labor and materials, or guarantees to the owner the promise of the contractor to pay for labor and

materials, those furnishing labor or materials have a right against the surety as third-party beneficiaries of the surety's contract, unless the surety's contract in terms disclaims liability to such persons. *Restatement (First) of Security* § 165 (1941).

documents express an intention on the part of [the sureties] to guarantee Pitt's promise to pay the subcontractors on this job." *Pitt General Contractors,* 769 F.Supp. at 1020. In fact, the analysis in *Pitt General Contractors* did not at all address the operation or purpose of the Miller Act.

The rationales of these cases can be summarized as follows. In *Diversified Engineers,* the court gave no indication that there was any sort of promise to pay the subcontractors and suppliers made by the prime contractor and guaranteed by a surety. Accordingly, that court's analysis was limited to the question of whether the Miller Act alone provided a recovery to the claimants. Similarly, in *Ardelt–Horn, Kimrey,* and *A & A Machine Shop,* the courts concluded that the statute alone did not provide recovery and that there was no express promise to pay the subcontractors and suppliers. In *Kalady,* the court concluded that recovery was permitted since it was both authorized by the Miller Act (albeit implicitly) and there was a promise to pay the employees by way of the promise to comply with the Labor Standards Provisions. In *Pitt General Contractors,* recovery was permitted exclusively on the basis of the express promise in the prime contractor's contract with the United States on a third-party beneficiary theory.

This Court has carefully reviewed these decisions and has determined that the proper analysis for this case most resembles the analysis followed in *Ardelt–Horn* and those cases following it. In this case, the Court is faced with an underlying contract [11] that does not provide any express promise to pay subcontractors and suppliers. C & G [12] argues that the "promise" can be found by the inclusion in the contract of the language of the Prompt Pay Act, 31 U.S.C. §§ 3901–07. That statute requires, in part, that each "con-

struction project awarded by an agency" include a clause that, in turn, requires that "each subcontract for property or services entered into by the prime contractor and a subcontractor" include, *inter alia:*

> (1) a payment clause which obligates the prime contractor to pay the subcontractor for satisfactory performance under its subcontract within 7 days out of such amounts as are paid to the prime contractor by the agency under such contract.

31 U.S.C. § 3905(b). Such a clause requiring the subcontract clause was part of ECM's contract with the United States. In addition, the prime contract contained a provision requiring ECM to submit, prior to receiving and progress payments under the contract, a certification stating, *inter alia:* "Payments to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made be made from the proceeds of the payments covered by this certification, in accordance with subcontract agreements and the requirements of [the Prompt Payment Act]." ECM did, in fact, sign at least three of these certifications although nothing in the record indicates whether these certifications were false. C & G argues that the effect of the language in these contract provisions was to create a promise by ECM to the United States that ECM will timely pay C & G and other subcontractors and suppliers. That promise, C & G reasons, became part of the "undertakings, covenants, terms, conditions, and agreements" guaranteed by Transamerica through its issuance of the performance bond.

This Court, however, is unwilling to read such a promise into the contract between ECM and the United States. First and most fundamentally, neither the precise language of the Prompt Payment Act nor the clauses

---

**11.** It should be noted at the outset of this analysis that the "contract" in the present case consists largely of the incorporation by reference of several "contract clauses" listed in the 1992 edition of a publication *Contract Clauses, Construction— Inside the U.S.* issued by the Department of Army, Corps of Engineers, New England Division. The complete contract was submitted to the Court pursuant to its request and the parties have stipulated to its inclusion as part of the record on this motion.

**12.** Although C & G is not the only Defendant opposing the Motion for Partial Summary Judgment, the two other Defendants that have joined this opposition, Henry Marine and Local Towing, specifically adopt and rely upon the arguments contained in C & G's memorandum on this motion.

in the primary contract impose a *statutory* obligation on ECM make prompt payment to its subcontractors. Rather, the provisions require ECM (1) to make a representation to the United States that it is in compliance with the Prompt Payment Act and (2) to make a contractual promise in its subcontracts to make timely payments. As long as ECM actually includes the clause promising prompt payment in its subcontracts and makes all necessary certifications, it is in full compliance with the statute.[13] The statute is not without effect, however, since a failure to make timely payments would constitute a breach of the subcontract and would enable the subcontractor to pursue remedies under that subcontract.[14] All contracts, by definition, between the prime contractor and subcontractors already include a promise to pay the subcontractor; the statute merely imposes certain characteristics on the promise.[15] More importantly, however, this Court notes language in the Prompt Payment Act indicating that enforcing provisions of the Prompt Payment Act in this proceeding would operate contrary to congressional intent. Section 3905(i) of the Prompt Payment Act provides:

> A dispute between a contractor and subcontractor relating to the amount or entitlement of a subcontractor to a payment or a late payment interest penalty under a clause included in the subcontract pursuant to subsection (b) or (c) of this section does not constitute a dispute to which the United States is a party. The United States may not be interpleaded in any judicial or administrative proceeding involving such a dispute.

31 U.S.C. § 3905(i). However, by pursuing this counterclaim under the Miller Act performance bond, of which the United States is the obligee, on the basis of violations of the Prompt Payment Act, C & G's claim flies in the face of this provision. Finally, C & G has failed to demonstrate on this motion that ECM has actually violated the Prompt Payment Act through either false or incomplete certifications or otherwise failing to promptly pay C & G.

Accordingly, the Court declines to follow this route—which would be even more circuitous than that in *Kalady*—in pursuit of a "promise" by ECM to pay its subcontractors. Before this Court provides such a legal effect to the contract provision regarding prompt payment, the result of which would be to permit a recovery under the performance bond at complete odds with the language of the Miller Act, it would have to be persuaded that this was the intended effect of the provision's language.

As C & G and Henry Marine conceded at oral argument, the absence of such an express promise is fatal to their claims under the performance bond since the Miller Act, in itself, clearly does not provide authority for a subcontractor or supplier to recover under the performance bond. A review of the plain language of the statute, as well as the entire statutory scheme, demonstrates that the drafters clearly intended to create a right of recovery for subcontractors and sup-

---

**13.** The Court notes, however, from its review of the Charter Agreement submitted on this motion that the contract does not contain the language required under the Prompt Payment Act. C & G's Response to Transamerica's Motion for Summary Judgment Ex. 4.

**14.** The Prompt Payment Act also provides, in part:

(j) Except as provided in subsection (i) of this section [which states that the United States is not a party to disputes under the Prompt Payment Act], this section shall not limit or impair any contractual, administrative, or judicial remedies otherwise available to a ... subcontractor in the event of a dispute involving a late payment or nonpayment by a prime contractor....

31 U.S.C. § 3905(j).

**15.** The legislative history of the Prompt Payment Act ("PPA") suggests that its purpose is not to create a statutory obligation for prime contractors to pay their subcontractors. The PPA was originally enacted in 1982 to address the problems created by the United States' failure to make timely payments to its contractors. The 1988 Amendments were designed to address the problems created when subcontractors are not timely paid. The report of the House of Representatives Committee on Government Operations also noted that prompt payment of subcontractors serves the government's interest as well since it "create[s an] incentive for increased competition for Government work, and, thereby, lower costs to the Government. H.R.Rep. No. 784, 100th Cong, 2d Sess. 9, *reprinted in* 1988 U.S.C.C.A.N. 3036, 3037.

pliers under the payment bond only. The performance bond is obtained "for the protection of the United States," and the payment bond is obtained "for the protection of all persons supplying labor and material."[16] 40 U.S.C. § 270a(a)(1), (2). Section 270b, which sets out the "Rights of persons furnishing labor or material," discusses the procedure to be following when a subcontractor or supplier brings a claim in the name of the United States on a payment bond exclusively, with absolutely no mention of the performance bond.

■ The bonds themselves consist of two different forms created pursuant to and required under federal acquisition regulations. 48 C.F.R. § 28.106–1 (1994) ("The following Standard Forms (SF's) shown in 53.301 and 53.302 shall be used ... when a bid bond, performance or payment bond ... is required."); § 53.228(b), (c) (1994) (provides standard forms "SF 25 (REV. 1/90), *Performance Bond*" and "SF 25–A (REV. 1/90), *Payment Bond*."). The sample bonds provided in the federal acquisition regulations are identical to the payment bond and performance bond issued by Transamerica here and the bonds' standard form numbers are printed at the bottom of each. Under the "Obligation" provision in both bonds, the "Principal" (here, ECM) and "Surety" (here, Transamerica) are "firmly bound to the United States ... in the above penal sum." Plaintiff's Statement of Material Facts (Docket No. 116) Exhibits 1, 2. The two bonds differ only in each bond's "Conditions" provision, which states in the performance bond that the obligation previously set out is void if the Principal "[p]erforms all the undertakings, covenants, terms, conditions, and agreements of the contract." In the case of

the payment bond, the obligation is void if the Principal "promptly makes payment to all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract." Therefore, the language used in the bonds under consideration is derived directly and precisely from the language and intent of the Miller Act itself. The bonds must, therefore, be read in light of the statute mandating that prime contractors obtain the bonds. *See In re Sinking of M/V Ukola*, 806 F.2d 1, 4–5 (1st Cir.1986) (" '[A] surety's obligation should be construed by reading together all instruments, statutes, and regulations underlying the transaction.' ") (quoting *St. Paul Fire and Marine Ins. Co. v. Commodity Credit Corp.*, 474 F.2d 192, 199–200 (5th Cir.1973)); *American Casualty Co. v. Irvin*, 426 F.2d 647, 650 (5th Cir.1970) ("A statutory bond will be reviewed in the light of the statute creating the duty to give security.").

■ While C & G acknowledges that the Miller Act did not provide a basis for recovery under the performance bond, it nonetheless asserts that nothing in the statute *precludes* such recovery if it is provided through the prime contract. The Court disagrees with this argument. Not only does the Miller Act not provide for recovery under the performance bond by subcontractors and suppliers, the Court concludes that the public policy of the Act would not be served by permitting such a recovery. Liability to subcontractors and suppliers under the performance bond would be unavoidable by sureties since the language used in Miller Act bonds is set through federal acquisition regu-

---

**16.** This "common sense" reading of the statute has been followed by the vast majority of parties and courts involved in Miller Act litigation. This Court notes, as did the *Diversified Engineers* court, that in many, if not all, decisions applying the Act, other than the four decisions discussed *supra*, the claims pursued under Miller Act bonds were brought under the payment bonds alone.

The Supreme Court's analysis of the Miller Act and its legislative history indicates that it has assumed that recovery by subcontractor and suppliers is limited to the payment bond;

The Miller Act was designed to meet these difficulties [encountered by creditors under the

Heard Act bonds] by requiring that the prime contractor execute two bonds—a performance bond to protect the Government and a payment bond to protect the creditors. Creditors can sue on the latter bond without waiting for the Government and even without waiting for completion of the project.

*MacEvoy*, 322 U.S. at 106 n. 4, 64 S.Ct. at 893 n. 4. The Supreme Court, in its entire discussion of the Miller Act in *MacEvoy*, makes absolutely no mention of a creditor's right to recovery under the performance bond.

lations and cannot be altered or amended. Furthermore, since the contract language required by the Prompt Payment Act is also mandatory, a finding in C & G's favor here would be the equivalent of ruling that *every* federal contract creates a third-party beneficiary relationship with respect to subcontractors and suppliers. As a result of such a finding, sureties would need to consider the fact that they would be liable on performance bonds, not only to the United States for the performance of the contract, but also to the subcontractors and suppliers for the sums owed to them as well. This would, no doubt, lead to a sharp escalation of premiums, the added costs of which would be passed on through the process to bidders and, ultimately, to the federal government.

Further, permitting both the United States and subcontractors to claim against the performance bond penal sum could result in a depletion of the funds available to make the United States whole. The Miller Act, unlike the Heard Act, makes no provision for priorities on the performance bond claims. The legislative history indicates that Congress intended the Miller Act, rather than provisions in the prime contract, dictate the surety's obligations on the performance bond. There is no language indicating that the provisions apply absent contract language to the contrary. Congress clearly intended to frame the rights and obligations of the surety, prime contractor, and subcontractors and suppliers through the statute's provisions.[17] Permitting recovery by subcontractors and suppliers on the performance bond to creep through the back door through this strained interpretation of the Miller and Prompt Payment Acts would yield a result directly contrary to the scheme devised by Congress to be an *improvement* of the process under the Heard Act.

Since the statute clearly indicates that subcontractors and suppliers may recover under the payment bond only, the subcontractors here are limited in their recovery to the penal sum of the payment bond. Further, as discussed *supra*, since this Court cannot discern in the primary contract any language indicating a departure from the structure of sureties' obligations and subcontractors' rights created under the Miller Act bonds, the statute governs the interpretation of the bonds. Accordingly, the record here does not demonstrate the existence of an genuine issue of material fact, and Transamerica is entitled to summary judgment on the counterclaims filed by C & G and Henry Marine seeking recovery on the performance bond.

### B. Recovery by C & G for the Loss of the Tender Boat, Pipeline, and Pipeline Barge

Transamerica also seeks summary judgment on C & G's claim for loss of the tender boat, pipeline, and barge during the towing from Delaware to Maine. Transamerica argues that such a claim is for "capital equipment" rather than for "materials" and, as such, that there is no basis for recovery under the Miller Act. C & G responds that

---

17. For example, the Supreme Court quoted the bill's sponsor, Representative Miller, stated that the bill establishing the Miller Act, " 'merely provides that in the construction of public buildings and other public works *there shall be two bonds*, one for the performance of the contract with the Government, and the other a payment bond for the protection of subcontractors and those furnishing the labor and material.' " *MacEvoy*, 322 U.S. at 110 n. 9, 64 S.Ct. at 895 n. 9.

Further, the Supreme Court has held that, through the enactment of the Miller Act, Congress intended to create federal statutory rights, rather than state law rights. *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 127, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703 (1974) ("The Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law."). None of the parties have made an argument on this motion regarding what state's law should apply to the analysis of the creation and scope of any third-party beneficiary rights created through the bonds.

This is not to suggest that Congress intended to displace all common law rights of subcontractors and suppliers to recover funds due to them from prime contractors, since that is clearly not the case. See *United States ex rel. Sunworks Division of Sun Collector Corp. v. Ins. Co. of N. America*, 695 F.2d 455, 458 (10th Cir.1982) (holding that recovery under the Miller Act is not the exclusive remedy available to subcontractors and suppliers and, consequently, subcontractors could seek recovery from contractor on quantum meruit theory). Rather, the Miller Act provides the authority when a subcontractor pursues a remedy under the bonds issued pursuant to that statute.

it should be permitted to pursue the claim since the Charter Party Agreement provided that ECM would assume all risk during the towage and would be responsible for all maintenance and repair. Therefore, C & G argues, when the equipment sank, ECM was in breach of its agreement with C & G, and C & G should be permitted to recover for this breach under the bond or bonds.

■ It is clear under the statute and case law that subcontractors and suppliers may not recover under a Miller Act payment bond for losses sustained to "capital equipment." Courts have defined "material" under the Miller Act provision permitting recovery to all those "supplying labor and material" as items which a supplier would reasonably believe would be consumed, or substantially consumed, in the project and which have no utility or economic value to the contractor after the project's completion. *U.S. ex rel. Sunbelt Pipe Corp. v. U.S. Fidelity & Guaranty Co.*, 785 F.2d 468, 470 (4th Cir.1986). Capital equipment, conversely, is any "thing which may reasonably be expected to be removed by the contractor and used in subsequent jobs." *Id.* Courts must "approach the problem from the perspective of the reasonable expectation of the *supplier.*" *U.S. ex rel. Brothers Builders Supply Co. v. Old World Artisans*, 702 F.Supp. 1561, 1566 (N.D.Ga.1988).

In a decision by the United States Court of Appeals for the Fourth Circuit, the panel affirmed a trial court determination that the pipeline purchased for use in dredging under a Miller Act contract was "capital equipment" since the evidence, including testimony by an expert, revealed that "dredging pipe is not usually consumed in the performance of a dredging project, and is commonly regarded as part of the dredger's capital equipment." *Sunbelt Pipe*, 785 F.2d at 471. The application of a similar analysis here is complicated somewhat by the fact that the equipment lost was *leased* to ECM by C & G. While the sale of such equipment would not be covered since the reusable equipment would not be "substantially consumed" in the course of the project, a rental charge for the use of equipment is "within the purview of the Miller Act bond because *the value of the*

*lease payment* is substantially consumed in the project." *U.S. ex rel. Eddies Sales & Leasing, Inc. v. Federal Insurance Company*, 634 F.2d 1050, 1052 (10th Cir.1980). This factor, C & G argues, is enough to distinguish the claim from that in *Sunbelt Pipe*; since ECM would not be able to use the equipment for future operations (without leasing it again, presumably), the items do not constitute "capital equipment."

The Court of Appeals for the First Circuit addressed a similar issue in *Moran Towing Corp. v. M.A. Gammino Construction Co.*, 363 F.2d 108 (1st Cir.1966). The panel observed that "in the case of rented equipment, not only does the surety's obligation include the rental, but if the principal has undertaken to repair, or to assume the expense of ordinary wear and tear, its failure to perform in this respect may be a matter covered by the bond." *Id.* at 115. The panel was extremely reluctant, however, to carry this principle as far as the Court of Appeals for the Fifth Circuit had in a case imposing liability on the surety for the *loss* of the equipment, *U.S. ex rel. Llewellyn Machinery Corp. v. National Surety Corp.*, 268 F.2d 610 (5th Cir.), *cert. denied*, 361 U.S. 914, 80 S.Ct. 259, 4 L.Ed.2d 184 (1959), and specifically rejected the rationale employed by the Fifth Circuit court in that case. *Moran Towing*, 363 F.2d at 115.

The *Moran Towing* panel concluded, however, that there was sufficient basis to impose liability for repair of *damaged* equipment there. The panel found the analysis in an earlier Fifth Circuit case, *Massachusetts Bonding & Ins. Co. v. United States ex rel. Clarksdale Machinery*, 88 F.2d 388 (5th Cir. 1937), to be applicable in its case. The critical factor under both cases, the panel concluded, was the fact that considerable damage to the equipment "was to be expected as a normal incident of the project," and, therefore, the supplier considered the equipment to be, in effect, "consumable material." *Moran Towing*, 363 F.2d at 116.

■ There is no indication in the record presented to the Court on this motion that any of the parties anticipated that the *loss* (and not merely damage) of the boats and accompanying equipment would be "expected

as a normal incident of the project." C & G's president testified at her deposition that she had anticipated making use of the pipeline in future dredging operations. Deposition of Carol C. Todd (Docket No. 115) Ex. 19. Unlike the agreement at issue in *Moran Towing*, there is no language in the Charter Agreement which could be considered to be mutual recognition that the loss of the equipment was expected. In the contract in *Moran Towing*, the lessee specifically assumed the liability for damage "occasioned by loading or unloading pieces weighing in excess of 1000 lbs. per piece." *Id.* at 110. The contract also provided that the lessee "properly load" each scow, since the "parties foresaw that jagged rocks, even of the agreed weight, could not be dropped into an empty scow without seriously damaging the hoppers." *Id.* at 113. The district court there found that "Gammino frequently loaded rocks weighing in excess of 1,000 pounds." *Id.* However, C & G cannot transform items that are unquestionably reusable "capital equipment," such as pipeline and boats, into "consumable material" by merely shifting the risk of loss.

The *Moran Towing* panel specifically warned against interpreting the Miller Act so broadly as to establish "an entirely new type of insurance coverage"; the Act's purpose, it emphasized, was to serve as "a substitute for liens which might otherwise have been claimed against the government construction." *Id.* at 115–16. It specifically rejected the approach in *Llewellyn Machinery Corp.*, which permitted recovery for loss of leased equipment solely on the basis of a clause between the lessor and lessee to the effect that the lessee assumed responsibility for the

loss, yet this approach is precisely what C & G asks this Court to follow.[18] The panel also pointed to cases in which the "mere failure of the contractor to perform all the undertakings of his contract ... [was] held not to be a sufficient basis for imposing liability," under a Miller Act bond. *Id.* at 116.[19]

Accordingly, since C & G has not demonstrated the presence of a genuine issue of material fact regarding whether the equipment it leased to ECM was reasonably expected to be consumed or substantially consumed in the performance of the contract, Transamerica is entitled to summary judgment on this issue.

### C. Attorneys' Fees

■ Finally, Transamerica seeks an entry of judgment from this Court on the issue of whether any of the interpleader defendants here are entitled to attorneys' fees from Transamerica. In *F.D. Rich Co. v. U.S. ex rel. Industrial Lumber Co.*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), the United States Supreme Court addressed the issue of attorneys' fees in Miller Act bond actions. In that case, the Supreme Court rejected the approach taken in federal appellate courts of applying state law to the awarding of fees, in order to create a "rule of uniform national application." *Id.* at 127, 94 S.Ct. at 2164. The Supreme Court also noted that the Miller Act itself does not establish an entitlement to attorneys' fees and it held, pursuant to the "American Rule" in attorneys' fees jurisprudence, such an entitlement should not be read into the statute's provisions. *Id.* at 128–29, 94 S.Ct. at 2164–65.[20]

---

**18.** The Fifth Circuit decision in *Llewellyn Machinery Corp.* was a divided one. In a vigorous dissent, Chief Judge Hutcheson observed that the other members of the panel appeared to have "lean[ed] heavily on the greatly overworked cliche that *the Miller Act is highly remedial and it is entitled to a liberal construction and application.*" *Llewellyn Machinery Corp.*, 268 F.2d at 612. Chief Judge Hutcheson argued that the application of the "cliche" in that instance "convert[ed] the surety on a Miller Act bond into a general insurer up to the limits of its bond of all property," *id.*, precisely the type of holding that the First Circuit panel sought to avoid in *Moran Towing*. The chief judge also objected, "as a complete non sequitur and therefore a begging of

the question, to the argument that, because the rental of the equipment is covered, the loss of it by sinking is also." *Llewellyn Machinery Corp.*, 268 F.2d at 612.

**19.** This Court's conclusion that the loss of the equipment is not recoverable *under the Miller Act bond* does not, of course, foreclose other remedies available to C & G such as pursuing a claim directly against ECM or its insurance carrier or against C & G's own insurance carrier.

**20.** The Supreme Court also acknowledged that there exist many exceptions to the "American Rule," which permit recovery of attorneys' fees

C & G, however, claims that it is entitled to recover attorneys' fees under the Charter Agreement.[21] Federal courts after *F.D. Rich* permit recovery of attorneys' fees from a surety where the contract between the contractor and subcontractor expressly permits such recovery or where one of the exceptions to the American Rule recognized under federal law, such as bad faith, applies. *See, e.g., U.S. ex rel. C.J.C., Inc. v. Western States Mechanical Contractors, Inc.*, 834 F.2d 1533, 1542–43 (10th Cir.1987); *U.S. ex rel. Krupp Steel Prods. v. Aetna Ins. Co.*, 831 F.2d 978, 983 (11th Cir.1987). In an attempt to demonstrate the presence of express contractual authorization for an award of attorneys' fees here, C & G relies upon language contained in the "Default" provision of the Agreement, which states, in pertinent part:

> [C & G] is hereby given a lien on all monies due or to become due to [ECM], to secure payment of any claims and demands that it may have hereunder including reasonable attorneys' fees and costs and expenses of collecting same. Upon charterer's default, owner shall have the right to, without affecting owner's title or right or possession of the vessel, declare due, sue for and recover all charges and amounts then accrued or thereafter accruing for the entire Charter Party term.

C & G's Response to Transamerica's Motion for Summary Judgment Ex. 4 at 6. C & G also points to cases permitting recovery of attorneys' fees by subcontractors from Miller Act bonds sureties where the subcontract permitted recovery of such fees. These cases, however, are of limited application to the claim made here. Contrary to C & G's argument in opposition to this motion, in each of the cases cited by C & G, the contractual provisions were not "similar" to the provision under consideration here. In none

was the right to attorneys' fees couched in terms of the right to a lien on funds withheld from the prime contractor or implied from the term "all charges" but, rather, the provisions clearly established that, if the subcontractor was required to obtain the services of an attorney to enforce its rights under the contract, it was entitled to recover its costs for such services. *See U.S. ex rel. Carter Equipment Co. v. H.R. Morgan, Inc.*, 554 F.2d 164, 165 (5th Cir.1977); *Travelers Indemnity Co. v. U.S.*, 362 F.2d 896, 899 (9th Cir.1966); *D & L Construction Co. v. Triangle Electric Supply Co.*, 332 F.2d 1009, 1013 (8th Cir.1964); *Ibex Industries, Inc. v. Coast Line Waterproofing*, 563 F.Supp. 1142, 1146 (D.D.C.1983).[22]

The effect of the Charter Agreement's language regarding attorneys' fees indicates that, in addition to its right of recovery under state law, C & G was provided with a lien on all funds which are owed to ECM and held by another. The extent of that lien is determined by the amount of the claim itself and the amount of any attorneys' fees incurred by C & G in its attempt to recover under the claim. Since the present action does not involve the imposition of a lien on money owed to ECM (if any such fund does exist with any other party), that clause of the agreement is inapplicable here. The sentence which follows permits C & G to declare due, and sue for, all charges accruing during the charter period and, unlike the preceding provision, contains absolutely no reference to attorney's fees. Absent any other express provision creating liability for attorneys' fees, no such fees are recoverable by any of the Defendants in this action.

## III. CONCLUSION

Accordingly, Plaintiff Transamerica's Motion for Partial Summary Judgment (Docket

---

where, for example, one party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons" or where the litigation serves "important public policies." *F.D. Rich Co.*, 417 U.S. at 129–30, 94 S.Ct. at 2164–65. *See also, U.S. ex rel. Garrett v. Midwest Construction Co.*, 619 F.2d 349 (5th Cir.1980).

**21.** Although two other Defendants, Henry Marine Service and Local Towing Corporation, notified this Court that they joined C & G in opposi-

tion to Transamerica's motion, neither provided this Court with any indication that they were entitled to attorneys' fees pursuant to any specific contractual provision.

**22.** This Court is also reluctant to place great reliance on the cases cited by C & G since two were decided prior to *F.D. Rich* and the other two do not appear to apply the Supreme Court's decision in that case.

No. 115) is *GRANTED* and it is hereby *ORDERED* that Transamerica is entitled to judgment as a matter of law on the counterclaims filed by C & G (Docket No. 88, Count II) and Henry Marine (Docket No. 89, Count II); that Transamerica is entitled to judgment as a matter of law against C & G to the extent that C & G seeks recovery from Transamerica for the loss of the tender boat LITTLE GEORGE, the pipeline, and the pipeline barge; and that Transamerica is entitled to judgment as a matter of law against any party herein to the extent that that party seeks recovery of attorneys' fees.